## Staunton

## Thomas O. Major, Administrator, Etc. v. Phillip Pickett Hoppe.

September 6, 1968.

Record No. 6736.

Present, All the Justices.

*James A. Eichner* (*Allen, Allen, Allen & Allen,* on brief), for plaintiff in error.

*Aubrey R. Bowles, Jr.* (*Bowles and Boyd,* on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Thomas O. Major, Administrator of the Estate of Barbara Elaine Major, plaintiff, instituted an action against Phillip Pickett Hoppe, defendant, to recover $35,000 for the wrongful death of plaintiff's decedent who was a guest passenger in an automobile operated by defendant. The motion for judgment alleged that defendant was operating the vehicle in a grossly negligent manner when it collided with an automobile being driven by Arthur C. Wingo, thereby causing the death of plaintiff's decedent.

A trial by jury was commenced on December 20, 1966. At the conclusion of plaintiff's evidence, defendant moved to strike it out and enter summary judgment in his favor on the grounds that the evidence was insufficient to establish gross negligence on the part of defendant, and that plaintiff's decedent was "guilty of contributory negligence or the assumption of risk" as a matter of law. The motion was overruled, and at the conclusion of all the evidence the motion was renewed on the same grounds. The trial court sustained the motion as to contributory negligence and the assumption of risk and entered summary judgment for defendant. We granted plaintiff a writ of error.

The record discloses that on Friday, April 30, 1965, about noon, Phillip Hoppe, Barbara Major and Vance Carter met at the Richmond Professional Institute where they were students. Carter had been invited earlier to be the weekend guest of Barbara Major and her family at their cottage near Coles Point, Virginia. It was arranged that he would be picked up later in the day for the visit. Hoppe had a red Corvette sports car which he had borrowed from a friend for the weekend. He and Barbara decided to drive to Irvington, Virginia for lunch. While there they shared two beers. At approximately 4 p.m. Barbara telephoned her mother, who was at her home in Richmond, stating that they would be late in their return because of a flat tire, and requested Mrs. Major to advise Carter. During the conversation Mrs. Major agreed that Barbara could extend an invi-

tation to Hoppe and his date, if he could secure one, to also be their guests at the cottage.

At approximately 8 p.m. Barbara telephoned Carter from the Rebel Club, a private club in Richmond where food and drinks were available to its members and guests. It was agreed that Barbara would be Hoppe's date for the weekend instead of Carter's, and that Carter would date Mary Stuart Gordon. After remaining at the club for about 30 minutes, Hoppe and Barbara drove to her parents' home in Richmond. There Hoppe conversed with Mrs. Major while Barbara changed her clothes. After leaving the Major residence, Hoppe and Barbara proceeded to Carter's home and picked him up at about 10 p.m.

Carter testified that there was a partially filled bottle of champagne in the car when he entered it. He did not know whether it had been recently purchased or how long it had been in the vehicle.

The Corvette sports car in which the parties were riding had two bucket seats. Between the two seats was a raised "tunnel" through which ran the drive shaft. This tunnel was approximately six to eight inches wide, with the forward portion being somewhat wider than the portion between the seats. The top to the car was down. When the three left Carter's home on the way to Mary Stuart Gordon's (hereinafter called Mary Stuart) apartment on Grove avenue, Hoppe was in the driver's seat, Carter was in the only passenger seat and Barbara was seated on the tunnel between the two with her feet in the footwell on the passenger's side along with those of Carter. With Mary Stuart's permission Carter took five bottles of beer from her ice box to carry to Coles Point. On re-entering the car he opened one of them.

After leaving Mary Stuart's apartment and up to the time of the fatal collision the seating arrangement was the same as before except for the addition of Mary Stuart who sat on Carter's lap with her feet in the footwell along with those of Barbara and Carter.

Hoppe drove the vehicle to the "U-Tote'M" store on Chamberlayne avenue. According to Carter and Mary Stuart, two six-packs of beer, two bottles of champagne, some paper cups and a newspaper were purchased there. Before departing Carter opened one of the bottles of champagne and poured some into two cups for Barbara and Mary Stuart. Both drank a portion of it.

The group, with the same seating arrangement, turned right off Chamberlayne avenue onto Laburnum avenue and stopped at a filling

station at the intersection of Laburnum and Nine Mile road. Hoppe went to the restroom and Carter purchased some cigarettes. Either at the filling station or just before reaching it a conversation developed, in the presence of Barbara, between Carter and Mary Stuart about changing drivers. Hoppe had driven a considerable distance that day, also Mary Stuart "was in an awfully bad mood" and not disposed to enter into the prevailing mood of the group. She had owned sports cars, was familiar with their operation and enjoyed driving them. Carter, who had no driver's license, testified that he suggested to Mary Stuart that Hoppe might let her drive; that Hoppe "could have been tired"; that out of courtesy to Hoppe and in an attempt to cheer up Mary Stuart he made the suggestion that she drive. However, no change was made and Hoppe continued to operate the vehicle toward Coles Point.

At the time of the accident Laburnum avenue proceeded southwardly from the filling station as a four-lane divided highway until it reached a point about 562 feet north of where the accident happened. There it merged into an undivided two-lane blacktop road 24½ feet wide with a shoulder on each side between three and four feet in width. Before reaching the point where the highway merged, traveling south, as was Hoppe, the divided highway crosses the Southern Railway tracks at grade and then, with a slight upgrade, passes over a bridge crossing Interstate Route 64. The divided highway ended in such a way that the two-lane road is an extension of the two southbound lanes, that is, the left lane of the two southbound lanes of the divided highway became the northbound lane of the two-lane road. At the time of the accident, which occurred about 11 p.m., the weather was clear and the night dark. There were no hatchmarks to indicate the merger and no painted lines on the two-lane road to indicate its edges or center.

According to Captain James R. Lindsey of the Henrico police force, who investigated the accident, there were in the vicinity of the accident reflectorized traffic control signs for southbound traffic. Just south of the bridge crossing Interstate Route 64 there was a sign stating that the speed limit was 45 miles per hour. Approximately 1000 feet before the highway merged into two lanes there was a "no passing" sign. Five hundred feet south of that sign was another stating "divided highway ends". On the two-lane road "very near the scene" of the collision there was a sign "pass with caution".

As has been stated the collision occurred about 562 feet south of

the point where the divided highway merged into a two-lane road. The road is straight for a considerable distance in both directions from the point of impact.

Arthur Wingo, who was driving a Plymouth sedan, testified that he was following about three car lengths behind a white station wagon proceeding north on the two-lane portion of Laburnum avenue "in the right hand lane" at about 35 miles an hour; that all of a sudden the station wagon flashed its brake lights and swerved to the right; that immediately thereafter the Corvette driven by Hoppe collided with his vehicle, and that he did not dim his headlights because he did not see the on-coming vehicle. The driver of the station wagon stopped, but drove off without identifying himself.

Hoppe testified that when he entered the two-lane road his vehicle was on the right hand side of it; that "all of a sudden there was a blinding sensation", and that he remembered nothing further until he regained consciousness in the hospital. He said that between the filling station and the point where he was blinded Carter "was adjusting the radio there was a lot of commotion. Every one was moving feet around, shifting around." Hoppe stated that he did not know whether the commotion interfered with his ability to control the car. He also stated that he was comfortable and "had plenty of room to drive".

Carter testified that Barbara was "sitting sideways" on the tunnel "slanted towards the passenger's side"; that he was leaning forward adjusting the radio and the girls were talking when the impact occurred; that Hoppe "wasn't driving too fast", and that he (Carter) did not see the approaching cars.

Mary Stuart stated that Barbara was "facing forward", and that the last thing she (Mary Stuart) remembered was that the Corvette was close to the right shoulder of the road, but could not say how far from the point of impact the car was at the time of this observation. She further stated that Barbara told her that "she wasn't entirely herself" because "she had had something to drink". Mary Stuart did not believe that the seating arrangement of the passengers obstructed Hoppe's view.

Napoleon Warriner, who was driving a Volkswagen bus about "three quarters of a city block" behind Hoppe, witnessed the accident. He said that Hoppe's vehicle "could have been near the center of the road" but was not on the wrong side of it.

Evelyn Lightfoot was driving her automobile behind Warriner's

vehicle. She testified that Hoppe's car was in the northbound lane of the two-lane road when the impact occurred. On cross-examination she said it was in the middle of the road.

Officer F. L. Mullikin arrived at the scene shortly after the mishap and before the cars involved had been moved. He testified that the Corvette operated by Hoppe was over an embankment upside down on the west side of the road facing north, and that the Plymouth driven by Wingo was partly on the shoulder of the east side and partly in the northbound lane. The two vehicles were 81 feet apart. It was apparent from the damage to each vehicle that they had collided head-on left front to left front. Upon further investigation, Mullikin found three gouge marks in the blacktop road surface of the northbound lane about four feet from the center of the road and asphalt on the broken front axle of the "totally demolished" Corvette. In addition, debris was found scattered "all over the area" for a distance of about 250 feet.

Dr. George R. Abbitt, Assistant Chief Medical Examiner for the Commonwealth of Virginia, testified that on the morning after the accident he withdrew a sample of blood from Barbara's dead body and that it showed the presence of 0.16 percent ethyl alcohol by weight. He expressed the opinion, among other things, that this blood alcohol level "would impair the ordinary individual's judgment and motor activity".

It was stipulated that Barbara Major, plaintiff's decedent, died as a result of the injuries sustained in the accident.

The plaintiff contends that the trial court erred (1) in striking his evidence and entering summary judgment for defendant, and (2) in admitting and excluding certain evidence.

■  The defendant argued in the court below, as he does here, in support of his motion to strike plaintiff's evidence, that the facts relied upon by plaintiff in establishing gross negligence are precisely the same facts which establish contributory negligence on the part of plaintiff's decedent. Plaintiff contended as the basis for gross negligence that "viewing the evidence in the light most favorable to the plaintiff, you have a man in disregard of warning signs, going entirely on the wrong lane for five hundred sixty-some feet, at all times for a distance of over a thousand feet, with approaching cars in plain view * * *". Defendant says that "* * * those facts were equally open and obvious to Barbara Major as they were to Hoppe and *Hoppe's conduct was in no way a greater act of negligence than hers*". With this we do not agree.

While it is true that a guest or passenger in a motor vehicle must exercise ordinary care for his own safety, that is not to say, as defendant concedes, that he has the same degree of duty to observe as that of the driver. *Mills* v. *Wells*, 204 Va. 173, 177, 129 S.E.2d 705, 709. It may well be that Barbara, plaintiff's decedent, had an *opportunity* "co-extensive with that of Hoppe" to observe the danger, yet that does not mean that her *duty* to observe was co-extensive.

In *Bernard* v. *Bohanan*, 203 Va. 372, 377, 124 S.E.2d 191, 195, the trial court refused to grant defendant's Instruction E, and error was assigned. The instruction provided: "* * * If, from her position on the front seat of the defendant's car, the plaintiff had equal opportunity as the defendant to observe the dangers, then it was her duty to do so and warn the defendant, and if she failed to do so, she was guilty of contributory negligence and cannot recover * * *." We held that the instruction incorrectly stated the principle of law, and said that "[t]here is no positive duty on the passenger to warn unless it is obvious that the driver is not taking account of the danger ahead".

In *Diggs* v. *Lail*, 201 Va. 871, 875, 114 S.E.2d 743, 747, we stated: "It is, of course, true that when a passenger *has observed* a dangerous situation of which the driver is apparently unconscious, it is the passenger's duty, if he is so situated that he can readily do so, to call the driver's attention to it; and if he fails to do so and is injured as a result of such failure, he is guilty of negligence. (Cases cited.) But, as we pointed out in *Atlantic Coast Line R. Co.* v. *Withers*, 192 Va. 493, 509, 65 S.E.2d 654, 662, the danger, if apparent, must have existed for such period of time as would enable the passenger to give timely warning." (Emphasis added.)

There was no conclusive evidence that Hoppe's inattention was apparent; that Barbara observed the danger; or that the time involved was sufficient to assess the danger and give warning.

There was no duty on Barbara, as a passenger, to observe the danger ahead without some indication that Hoppe was not keeping a proper lookout. The only indication she might have had, absent actually seeing the danger, was the fact that she had been riding with him during much of the day and might surmise that he was tired. But having ridden with him for a considerable distance might also have convinced Barbara of his competence and alertness as a driver. There was no evidence that Hoppe had given her reason to doubt his ability to drive properly until he drove on the wrong side of the

road. The conversation, in the presence of Barbara, concerning Hoppe's possible tiredness and the suggestion of a shift in drivers was between two people who had only ridden with Hoppe a short distance that night and whose motives for the discussion were not based on any indication of bad driving by him; the suggestion arose out of courtesy to Hoppe and an attempt to cheer up Mary Stuart who was in a bad mood. The evidence did not conclusively show that Barbara saw the danger ahead. Carter testified that she was "sitting sideways" on the tunnel "slanted towards the passenger's side". Mary Stuart said that she was "facing forward".

Viewing the evidence adduced and reasonable inferences therefrom in the light most favorable to plaintiff, as we must, we cannot say that Barbara, plaintiff's decedent, was guilty of contributory negligence as a matter of law. We therefore find that the trial court erred in so holding.

The plaintiff next contends that the trial court erred in admitting the testimony of Dr. Abbitt.

As has been stated, Dr. Abbitt testified that on the morning following the accident he extracted a blood sample from Barbara's body; that it contained 0.16 percent of ethyl alcohol by weight, and that this blood alcohol level would impair the ordinary individual's judgment and motor activity. Plaintiff objected to Dr. Abbitt's testimony on the ground that it was irrelevant. We do not agree. It was relevant to the issue of contributory negligence. If Barbara, realizing that Hoppe was not keeping a proper lookout, saw the danger, appreciated it, and failed to give warning, if there was time to do so, she was contributorily negligent. The fact that her ability to use due care for her own safety may have been influenced by the voluntary consumption of alcohol will not excuse her from its consequences. The testimony of Dr. Abbitt tended to show the degree of Barbara's ability to assess the danger, if she observed it, and her ability to give timely warning, if there was an opportunity to do so, and was admissible for this purpose.

The plaintiff also claims that the trial court erred in admitting the testimony of Carter and Mary Stuart concerning the placing of beer and champagne in Hoppe's car and the consumption of it. He points out that at conference in chambers before the trial commenced defense counsel stated that Hoppe's position was that he had not been drinking to the extent that it affected his ability to drive. Thus, plaintiff says such evidence was irrelevant and prejudicial. But the testi-

mony of Carter and Mary Stuart contained no evidence of Hoppe's drinking and so was outside the scope of the pretrial ruling and therefore not excluded by it.

On the other hand, Hoppe asserts that it was proper for him to show the entire background of the case relating to Barbara's conduct and her right to recover. He argues that the testimony of Carter and Mary Stuart relating to alcoholic beverages was admissible as an element tending to show that Barbara was contributorily negligent and assumed a risk which would bar a recovery.

We agree that that portion of their testimony relating solely to Barbara's actual drinking and its effect on her was relevant to the issue of contributory negligence and admissible for the same reason as that of Dr. Abbitt. However, the balance of their testimony regarding the beer and champagne was not relevant.

The presence of alcohol in the car, Carter's and Mary Stuart's drinking and the seating arrangement had no causal connection with the accident. Therefore, any risk which Barbara assumed thereby was immaterial. "* * * [A]n injured person is precluded from recovery only if the injury results from the very danger of which he has knowledge * * *. If he is injured by some additional negligent act, he has not assumed the risk of it." *Fred Harvey Corp.* v. *Mateas,* 170 F2d 612, 615. "The doctrine of assumption of risk is inapplicable where the danger and peril of the situation were not the proximate cause of the injuries, * * *." 65A C.J.S., *Negligence.* § 174(4) p. 299, 300. See also *Ringling Bros.-Barnum & Bailey Combined Shows, Inc.* v. *Olvera, et al.,* 119 F.2d 584; *Matthews* v. *Cumberland & Allegheny Gas Co.,* 138 W. Va. 639, 77 S.E.2d 180; *Muskin* v. *Gerun, et al.,* 46 Cal. App. 2d 404, 116 P.2d 105, 108; *Larson* v. *Meyer,* 135 N.W.2d 145, 164. (N.D.)

There was no proof that Hoppe had at any time prior to driving on the wrong side of the road so conducted himself or so operated the vehicle in an improper manner as to put Barbara on notice that he might drive negligently. Therefore, she cannot be said to have assumed the risk of his negligence, and the doctrine of assumption of risk is not applicable under the evidence adduced. Hoppe concedes that there was no evidence that alcohol caused any of the passengers to interfere with his operation of the car. Moreover, Hoppe asserts that he "has never claimed that the presence of four people in the two-seated car interfered with his driving of the car". There was no evidence to the contrary. That being the case, the

testimony of Carter and Mary Stuart concerning the placing of the beer and champagne in the car and the consumption of a portion of it by them was irrelevant as an element tending to show that Barbara assumed a risk which would bar recovery, and inadmissible for this purpose as it tended to confuse and mislead the jury.

Finally, plaintiff contends that the court erred in refusing to admit in evidence two aerial photographs of Laburnum avenue in the vicinity of the accident. (Exhibits 1 and 2.)

The plaintiff was permitted to introduce his Exhibit 3, a map prepared by certified surveyors showing the highway as it existed at the time of the accident. The refused photographs did not portray an accurate picture of the road as it existed when the accident occurred. They clearly show a number of white hatch marks at the point where the four lanes of Laburnum avenue merged into two lanes, and south of the point of merger they show a broken white line in the center of the two-lane road. None of these markings was present when the accident occurred. They were painted the next day. Under the circumstances we hold that there was no error in rejecting the aerial photographs.

For the reasons stated, we reverse the judgment appealed from and remand the case for a new trial on all issues.

*Reversed and remanded.*