721 P.2d 1177

**Nell SAHF, as guardian for Charles Scrabeck, an incapacitated person, and Individually, Plaintiffs-Appellants,**

v.

**LAKE HAVASU CITY ASSOCIATION FOR THE RETARDED AND HANDICAPPED, a non-profit corporation, and The State of Arizona, a governmental body, Defendants-Appellees.**

**No. 1 CA–CIV 8488.**

Court of Appeals of Arizona, Division 1, Department D.

June 17, 1986.

Miller & Pitt, P.C. by David A. Thomson, John L. Tully, Tucson, for plaintiffs-appellants.

Weyl, Guyer, MacBan & Olson, P.A. by Suzanne P. Clarke, Phoenix, for defendants-appellees Lake Havasu City Assn.

Sorenson, Moore & Julian by George R. Sorenson and John S. Schaper, Phoenix, for defendant-appellee State of Ariz.

## OPINION

BROOKS, Judge.

The two primary issues raised in this appeal are (1) whether the appointment of a guardian for an incapacitated person starts the running of a statute of limitations tolled by that incapacity and (2) whether an organization which furnishes residential living services to developmentally disabled individuals under contract with the Arizona Department of Economic Security is a "licensed health care provider" for purposes of actions for medical malpractice.

## FACTS

On June 13, 1984, Nell Sahf, the mother and guardian of Charles Scrabeck, filed a complaint in her individual capacity and on behalf of Scrabeck against the Lake Havasu City Association for the Retarded and Handicapped (Lake Havasu) and the State of Arizona. The complaint alleged that Scrabeck sustained personal injuries in 1981 as the result of negligent care while he was a resident of a group home operated by Lake Havasu. Those injuries were identified as an infected burn injury to Scrabeck's foot and a pressure sore on his right buttock and hip resulting in an infection requiring the surgical removal of the right hip joint.

The complaint also alleged that the State of Arizona is vicariously liable for the acts of Lake Havasu and is liable for negligently certifying, inspecting and supervising the group home.

Lake Havasu filed a motion to dismiss on grounds that the action was barred by A.R.S. § 12–542, the two-year statute of limitations for ordinary negligence. Sahf responded that the action was for "medical malpractice" and was therefore subject to a three-year statute of limitations under A.R.S. § 12–564(A). Sahf also argued that any statute of limitations had been tolled pursuant to A.R.S. § 12–502 because Scrabeck was an incapacitated person. Lake Havasu contended that it was not a "licensed health care provider" and therefore was not subject to suit for medical malpractice. Additionally, it argued that the tolling statute was inapplicable where a guardian had been appointed.

The trial court held that Lake Havasu was not a licensed health care provider; that A.R.S. § 12–542 was applicable; and A.R.S. § 12–502 did not toll the period of limitations because Scrabeck had a guardi-

an. Accordingly, it granted Lake Havasu's motion to dismiss.

The State of Arizona later filed a motion for summary judgment on the same grounds and judgment was entered in favor of the state on May 30, 1985. Sahf filed a timely appeal to this court from the judgments.

## SCOPE OF REVIEW

Lake Havasu obtained judgment granting a motion to dismiss the complaint on grounds that A.R.S. § 12–542 bars the action.

Appellees appear to argue on appeal that the judgment in favor of Lake Havasu must be upheld not only for the reasons stated by the trial court but also because the complaint was insufficient to withstand a motion to dismiss. They point to the absence in the complaint of any allegations that Scrabeck was a person of unsound mind or that Lake Havasu was a licensed health care provider. Sahf first raised these contentions in response to the motion to dismiss.

The record is clear that Lake Havasu did not identify these alleged insufficiencies in the complaint in support of its motion to dismiss. To the contrary, in its reply to Sahf's response, Lake Havasu stated "... Charles Scrabeck is mildly mentally retarded and should probably be deemed of unsound mind within the meaning of A.R.S. § 12–502." It then argued the tolling issue on its merits. Lake Havasu and Sahf also argued whether Lake Havasu was a licensed health care provider as a matter of law. Lake Havasu did not argue that it was entitled to judgment on the basis of insufficiency of the pleadings. The motion and subsequent responsive pleadings focused on legal issues relevant to whether the litigation was barred by A.R.S. § 12–542.

■ This court will not consider issues and theories not presented to the court below. *Richter v. Dairy Queen of Southern Arizona, Inc.*, 131 Ariz. 595, 643 P.2d 508 (App.1982). Thus we do not consider whether the complaint was fatally deficient in failing to *expressly* identify Scrabeck as a person of "unsound mind" and Lake Havasu as a "licensed health care provider."

■ On review of granting a motion to dismiss, the truth of the allegations must be assumed. *Summerfield v. Superior Court*, 144 Ariz. 467, 698 P.2d 712 (1985). Dismissal can be upheld only if Sahf or Scrabeck would not be entitled to relief under any facts susceptible of proof under the claims stated. *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 677 P.2d 1292 (1984); *Bischofshausen v. Pinal-Gila Counties Air Quality Control Dist.*, 138 Ariz. 109, 673 P.2d 307 (App.1983). For purposes of the dismissal of the complaint against Lake Havasu, we consider Lake Havasu's position before the trial court to be a concession that the complaint avers that Scrabeck is of unsound mind and we assume the truth of that allegation.

■ The State of Arizona was granted summary judgment. For purposes of that motion the state conceded that Scrabeck was a person of "unsound mind" within the meaning of A.R.S. § 12–502. In reviewing a grant of summary judgment, the evidence and inferences drawn therefrom must be viewed in a light most favorable to the party opposing the motion. *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 694 P.2d 181 (1984). The granting of summary judgment is only proper where two prerequisites have been met: first, after examining the entire record there is no genuine dispute as to any material fact and that only one inference can be drawn from the undisputed material facts; second, based upon the undisputed material facts the moving party is entitled to judgment as a matter of law. *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 639 P.2d 330 (1982).

For purposes of the appeal of both judgments we assume the following facts to be true. Charles Scrabeck has been mentally retarded since birth. He was adjudged an incapacitated person and placed under the guardianship of his mother, Nell Sahf, on September 24, 1979 by order of Mohave County Superior Court.

DOES THE APPOINTMENT OF A GUARDIAN START THE RUNNING OF A PERIOD OF LIMITATION TOLLED BY A.R.S. § 12–502 FOR PERSONS OF UNSOUND MIND?

A.R.S. § 12–502 provides:

A. If a person entitled to bring an action other than those set forth in Article 2 of this chapter is at the time the cause of action accrues either under eighteen years of age or of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action. Such person shall have the same time after removal of the disability which is allowed to others.

In *Allen v. Powell's International, Inc.,* 21 Ariz.App. 269, 518 P.2d 588 (1974) this court held that, for purposes of A.R.S. § 12–502, a person of "unsound mind" is unable to manage his affairs or to understand his legal rights or liabilities. There is no express exception in A.R.S. § 12–502 for persons under guardianship. However, the trial court concluded that the tolling statute is inapplicable where a person adjudicated to be mentally incompetent has a guardian who is capable of filing a lawsuit on behalf of her ward. We find no Arizona appellate decisions which address this issue.

In the jurisdictions where this issue has been considered, the majority have held that their respective statutes of limitations are tolled on claims held by an incompetent even though a guardian has been judicially appointed. *See generally* Annot. 86 A.L.R.2d 965 (1962); 51 Am.Jur.2d *Limitation of Actions,* § 189 (1970). *See, e.g., Mason v. Sorrell,* 260 Ark. 27, 551 S.W.2d 184 (1976); *Gottesman v. Simon,* 169 Cal.App.2d 494, 337 P.2d 906 (1959); *Whalen v. Certain-Teed Products Corp.,* 108 Ga.App. 686, 134 S.E.2d 528 (1963); *Paavola v. St. Joseph Hospital Corp.,* 119 Mich.App. 10, 325 N.W.2d 609 (1982); *Young v. State Dept. of Social Services,* 92 Misc.2d 795, 401 N.Y.S.2d 955 (1978).

Although Arizona has not considered whether the appointment of a guardian starts the running of a period of limitation for persons of unsound mind, our supreme court has discussed the effect of guardianship upon an infant's right to bring a lawsuit.

In *Barrio v. San Manuel Division Hospital for Magma Copper Co.,* 143 Ariz. 101, 692 P.2d 280 (1984), the Arizona Supreme Court held that the personal injury action of an injured minor is tolled by A.R.S. § 12–502 regardless of whether the minor has a parent or guardian who could have brought suit on his behalf. The court held that A.R.S. § 12–564, which shortened the statute of limitations for minors injured by medical malpractice, was unconstitutional because it deprived the minor of his cause of action while he was under a disability and powerless to act on his own behalf. The court noted that even though there might be a parent or guardian who could assert the claim on behalf of the minor, the period of limitation was tolled by A.R.S. § 12–502 because there can be no guarantee that the minor's claim would be asserted by that parent or guardian. *Barrio,* 143 Ariz. at 107, 692 P.2d at 286.

Appellees attempt to distinguish *Barrio* because infancy unlike "unsound mind" will eventually terminate. They point out that statutes of limitations are intended to protect defendants from stale claims, and argue that this policy would be undercut by disallowing any limitation against an incapacitated person who in all probability will remain of "unsound mind" throughout his lifetime.

Appellees further contend that the disability to be protected by A.R.S. § 12–502 is not "infancy," or "unsound mind" but the inability to sue. They argue that this disability is removed when a guardian is appointed who is under a legal duty to bring actions on behalf of his or her ward. Apparently this is also an attempt to distinguish *Barrio* in which the court stated:

The statute [A.R.S. § 12–564] makes no exceptions for children who have unconcerned parents, children in foster care, or

those in institutions.... It applies to those with guardians and those without.

\* \* \* \* \* \*

We hold that a statute which requires a minor injured when below the age of seven to bring the action by the time he is ten—regardless of his ability to do so, and without concern for the nature of his adult caretakers—does not provide reasonable alternatives. The statute abolishes the action before it reasonably could be brought....

143 Ariz. at 107, 692 P.2d at 286.

■ Thus, appellees argue that the tolling statute should not apply where a guardian with a legal duty to bring appropriate lawsuits on behalf of her ward has been appointed and where that guardian has full knowledge of the facts. We are not persuaded that A.R.S. § 12–502 is subject to such an interpretation.

In reversing the trial court's judgment that a mentally incompetent person's disability was removed when a guardian was appointed, the Michigan Court of Appeals in *Paavola v. St. Joseph Hospital Corp.*, *supra*, was confronted with the same arguments raised by appellees here. In construing its tolling statute the court noted that the term "disability" did not mean "disability to bring suit" but referred to the express statutory conditions requiring tolling, i.e., infancy, insanity or imprisonment.[1] *See also Klosky v. Dick*, 359 Mich. 615, 103 N.W.2d 618 (1960).

The Michigan Court of Appeals also noted that its statute made no distinction between disabilities of infancy and insanity for tolling purposes and that the distinction was not warranted. Quoting *Wolf v. United States*, 10 F.Supp. 899, 900 (S.D.N.Y. 1935), the court stated:

The view is taken that the legislature had in mind, not merely inability to sue,

but also the difficulties of the incompetent in giving information and testifying.

325 N.W.2d at 611.

Finally, the court held that:

Nothing in Michigan's statute suggests legislative intent that an insane person's exemption from the running of periods of limitation is to end upon appointment of a guardian for him or her. We adopt the view generally held in other jurisdictions and hold that appointment of a guardian for an insane person does not constitute removal of the insane person's disability for purposes of [the tolling statute].... Defendant urges that our holding effects the "impalatable result" that the guardian of a mentally incompetent person may bring suit on the ward's behalf during the entire period of mental incompetency—a period potentially many decades long. In our judgment, however, a contrary holding would constitute unjustifiable tampering with the significant public policy clearly reflected in [the tolling statute] the protection and preservation of substantive rights of mentally incompetent persons.

325 N.W.2d at 611.

We find this reasoning persuasive and consistent with Arizona case law.

Arizona recognizes that an action for personal injury is a fundamental right guaranteed by the Arizona Constitution. *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984). Further, *Barrio* makes clear that the controlling consideration under Arizona law is the inability of the injured individual to bring an action on his own behalf, not the possibility that a guardian or parent will assert his rights. This is in accord with Arizona's clear policy of protecting the disabled from statutes of limitations. *See, e.g., Brooks v. Southern Pacific Co.*, 105 Ariz. 442, 466 P.2d 736 (1970).

■ Appellees also argue that A.R.S. § 12–502 excuses only the person under

1. M.C.L. § 600.5851(1) (M.S.A. § 27A.5851(1)) provides:

If the person first entitled to make an entry or bring an action is under 18 years of age, insane or imprisoned at the time his claim accrues, he

or those claiming under him shall have one year after his disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations have run.

disability and not the guardian. They conclude that a guardian may not bring an action on behalf of her ward when the limitation has run. We find no merit to this argument. Obviously, the effect of preventing a guardian from bringing an action would be to punish the incapacitated person. This argument has been rejected expressly or implicitly in other jurisdictions where guardians have been permitted to bring actions on behalf of their wards after a period of limitations has run. *See e.g., Gottesman v. Simon, supra; Whalen v. Certain-Teed Products Corp., supra.*

On its face, A.R.S. § 12–502 provides no exception for the appointment of a guardian for persons of "unsound mind." We are of the opinion that in the absence of clear legislative intent, we should not graft such an exception on the statute. We find this position consistent with the principles set forth by our supreme court in *Kenyon* and *Barrio* and in accord with the majority of other jurisdictions. Thus, as to Scrabeck, A.R.S. § 12–542 is not a bar to this litigation.

We note, however, that Sahf has failed to distinguish between those portions of the complaint seeking relief for her as an individual and those portions seeking relief on behalf of her ward. Sahf sought recovery of damages to her as an individual for expenses incurred in providing medical treatment to Scrabeck, loss of consortium and emotional distress.

■■■ A tolling statute such as A.R.S. § 12–502 is applicable only to the personal claims of those for whose benefit the statute was enacted. Therefore, a parent who seeks to recover medical expenses or damages for the personal loss sustained as a result of an injury to a child cannot claim the protection of the tolling statute. While the incapacitated person's claim may be saved by such a statute, the claim of the parent who is under no disability may be barred by the applicable statute of limitations. *See Macku v. Drackett Products Co.,* 216 Neb. 176, 343 N.W.2d 58 (1984). Similarly, this rule is applicable to a claim by a guardian who seeks to recover for expenses incurred on behalf of a ward and for other personal losses. *Gottesman v. Simon, supra.* We conclude that Sahf's individual claims were not tolled and we must therefore determine whether her individual claims were barred by A.R.S. § 12–542.

## IS SAHF'S CLAIM ONE FOR "MEDICAL MALPRACTICE"?

The complaint describes personal injuries occurring to Scrabeck arising out of negligence in assisting and supervising his residential environment.

■■ Sahf argues that Lake Havasu's residential living services were "health care" and that its contract with the Arizona Department of Economic Security (DES) to provide those services equates to a "license." Thus, Sahf argues that Lake Havasu was a "licensed health care provider" within the meaning of the medical malpractice statute. In this regard, we first find that it was Sahf's burden to prove that Lake Havasu was a licensed health care provider in order to avoid application of the two year statute of limitations provided for simple negligence in A.R.S. § 12–542.

In support of her position Sahf relies upon definitions from both the Medical Malpractice Act, A.R.S. § 12–561 *et seq.,* and the statutes dealing with health care institutions, A.R.S. § 36–401 *et seq.*

A.R.S. § 12–561 provides in part:

1. 'Licensed health care provider' means a person, corporation or institution licensed or certified by the state to provide health care, medical services, nursing services or other health-related services and includes the officers, employees and agents thereof working under the supervision of such person, corporation or institution in providing such health care, medical services, nursing services or other health related services.

A.R.S. § 36–401(A) provides in part:

15. 'Health-related services' means services, other than medical, pertaining to general supervision, protective, pre-

ventative and personal care services or supervisory care services.

\* \* \* \* \* \*

24. 'Personal care services' means assistance with eating, bathing and dressing for individuals who are in need of a protective environment.

Thus, Sahf concludes that because a residential care facility for developmentally disabled persons provides personal care services, it is a "health care provider." She then equates the residential facility's certification by the DES to provide residential care as "licensure" for purposes of A.R.S. § 12–561.

In evaluating Sahf's argument, we consider it in the context of the history and statutory scheme of A.R.S. § 12–561 *et seq.*

Arizona's Medical Malpractice Act was passed in response to a perceived crisis in the health care industry. *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977). At the time the Act was passed there was evidence before the legislature that "medical malpractice insurances costs, as well as hospital professional liability costs, were doubling every three years." *Eastin,* 116 Ariz. at 583, 570 P.2d at 571. The Act was directed toward a given class as a legislative response to difficulties faced by doctors and hospitals in obtaining insurance coverage at reasonable rates. *Id.,* 116 Ariz. at 584, 570 P.2d at 572.

In *Kenyon v. Hammer,* our supreme court held that the determinative factor in deciding whether a particular claim falls within the malpractice statute is the identity of the person against whom it is asserted. The court stated:

In the case at bench, for example, there is nothing about the claim that falls within the commonly accepted conception of 'malpractice.' The act of negligence did not involve professional judgment, special skills or training, but only a clerical or mechanical error in transposing information to the office chart. *The statute is quite clear; it is not the type of claim which determines special treatment, it is the identity of the person against whom it is asserted. A*

*malpractice claim asserted against an unlicensed health care provider is not covered by the statute.* ... Even if not of the true malpractice variety, a claim falls within the statute if it is made against a licensed health care provider and is 'based upon' the defendant's alleged negligent conduct 'in rendering of health care, medical services ... or other health related services.'

142 Ariz. at 77, 688 P.2d at 969 (emphasis added.)

Neither the statute nor *Kenyon* indicates by whom a health care provider is licensed. Appellees urge that the statute can be interpreted reasonably to refer *only* to health care providers licensed by the Arizona Department of Health Services (DHS).

DHS was created in 1973 to integrate the regulation of health services into one department. *See* Laws 1973, Ch. 158, §§ 1 and 3.

At the same time the legislature transferred various powers and duties to DHS, it also transferred the powers and duties of the then existing Department of Mental Retardation to the Department of Economic Security (DES). *See* Laws 1973, Ch. 158 § 104 *et seq.* DES was to function as a mental retardation (now "developmental disabilities") authority for the state. Laws 1973, Ch. 158 § 105; Laws 1981, Ch. 195 § 4. *See also* A.R.S. § 36–552(A). DES was directed to plan and develop statewide programs and services for the mentally retarded, including residential programs, and was to establish standards and provide technical assistance and supervision. DES was given authority to contract for services with private agencies and make rules and regulations for residential programs. Laws 1973, Ch. 158 §§ 108, 110, 111; A.R.S. §§ 36–552(D), –554(A)(1)(C), and –558(A).

■ This history indicates that the legislature considered the provision of residential services to the developmentally disabled as a separate function from the provision of "health care services." The departments respectively responsible for

health care services or services to the developmentally disabled have adopted regulations conforming to this separation of functions.

DHS adopted regulations governing the licensing of health care institutions pursuant to A.R.S. § 36–136(G). Among those regulations is A.C.R.R. R2–10–114 which classifies the major categories of health care institutions as hospitals, nursing care institutions, outpatient treatment centers, residential care institutions, home health agencies, infirmaries, and behaviorial health services. The only classification which could apply to Lake Havasu is "residential care institution."

"Residential health care institutions" are defined in A.C.R.R. R9–10–113(B)(30) as:

> a health care institution other than a hospital or nursing care institution which provides resident beds and health-related services for persons who do not need in-patient nursing care. *However, residential care institutions do not include:*
>
> A. *Facilities for the mentally retarded* except that any other class of health care institution in such facilities shall be appropriately licensed....

(Emphasis added.)

DHS apparently recognizes that while some definitions of "health related services" are broad enough to encompass services provided for mentally retarded citizens in residential living institutions, the facilities themselves were not to be regarded as "health care institutions" for purposes of licensing requirements. The regulation in its present form was adopted in 1981.

Ordinarily, courts give great weight to the interpretation of a statute by the agency responsible for its implementation. *Marlar v. State*, 136 Ariz. 404, 666 P.2d 504 (App.1983). Although the ultimate responsibility for interpreting statutes rests in the courts, deference is often given to a long standing agency interpretation of an ambiguity in the statute. *See City of Mesa v. Killingsworth*, 96 Ariz. 290, 394 P.2d 410 (1964); *Morris v. Arizona Corp. Comm'n.*, 24 Ariz.App. 454, 539 P.2d 928 (1975).

While A.R.S. § 12–561 does not explain "licensed," it is in accord with the overall statutory scheme that the "license" referred to is a license from DHS—the department created for the sole purpose of controlling licensing standards for health care institutions. This interpretation is consistent with the manner in which both DES and DHS have interpreted their respective roles. The fact that occupants of a residence may from time to time become the victim of illness or accident does not convert that residence into a "health care institution" within either the meaning of the Medical Malpractice Act or the Licensing Act. Thus, we conclude that Lake Havasu is not a "licensed health care provider" and is therefore not subject to suit for medical malpractice.

Sahf's claim against Lake Havasu must, therefore, be viewed as one for ordinary negligence brought more than two years after the cause of action accrued. The claim is therefore barred by A.R.S. § 12–542.

Sahf's claim against the state was both for vicarious liability arising from its alleged control over Lake Havasu and independent negligence in certifying and supervising the group home facility. As Lake Havasu cannot be held liable, the state cannot be held vicariously liable. *See Womack v. Preach*, 64 Ariz. 61, 165 P.2d 657 (1946); *Reese v. Cradit*, 12 Ariz.App. 233, 469 P.2d 467 (1970). Further, the claims for negligent supervision and certification are not malpractice claims because the state is clearly not a "licensed health care provider." Therefore, these claims are also barred by A.R.S. § 12–542.

## CONCLUSION

The judgment of the trial court dismissing that portion of the complaint seeking recovery by Nell Sahf in her individual capacity against Lake Havasu is affirmed. Likewise, summary judgment in favor of the state on Sahf's individual claims is affirmed. The judgments in favor of Lake Havasu and the State of Arizona on the

claims of Charles Scrabeck brought on his behalf by Sahf are reversed and this matter is remanded to the trial court for proceedings in accordance with this opinion.

GRANT, P.J., and FROEB, J., concur.