836 P.2d 106 (1992)
114 N.M. 187
M.D.R. and K.L.R., individually and as Next Friends of M.R., S.R., and J.R., minors, Plaintiffs-Appellants,
v.
STATE of New Mexico ex rel. HUMAN SERVICES DEPARTMENT, Defendant-Appellee.
No. 12679.
Court of Appeals of New Mexico.
July 10, 1992.
*107 Edward L. Hand, John F. Schaber, P.A., Deming, for plaintiffs-appellants.
David McNeill, Jr., Thomas A. Sandenaw, Jr., Weinbrenner, Richards, Paulowsky, Sandenaw & Ramirez, P.A., Las Cruces, for defendant-appellee.

OPINION
BLACK, Judge.
Plaintiffs filed suit against the State of New Mexico, Department of Human Services (the Department), under the Tort Claims Act. NMSA 1978, §§ 41-4-1 to -27 (Repl.Pamp. 1989) (the Act). The district court dismissed the complaint on the basis of governmental immunity. While the complaint alleges deplorable conduct by the Department, the Act does not waive the State's immunity from tort liability under the circumstances of this case. We affirm.

ALLEGATIONS.
Plaintiffs, foster parents licensed by the Department, allege that: a Department social worker placed a foster child in their home knowing the child had a history of sexual abuse of other children; the social worker did not inform Plaintiffs of this history; and the foster child sexually abused Plaintiffs' children repeatedly over a long period of time.

INTERPRETATION OF THE ACT AND STANDARD OF REVIEW.
It is true that employees of the Department have "a responsibility to oversee and supervise the safety and well-being of children entrusted to [the Department]." Perkins v. Department of Human Servs., 106 N.M. 651, 656, 748 P.2d 24, 29 (Ct.App. 1987). But it does not necessarily follow that the Department may be held liable under the Act for a breach of that duty. The Act declares that governmental entities and public employees shall only be liable within the limitations of its provisions. § 41-4-2(A). Governmental entities and public employees, while acting within the scope of their duties, are immune from tort liability except as waived by the Act. § 41-4-4(A); see also Tompkins v. Carlsbad Irrigation Dist., 96 N.M. 368, 630 P.2d 767 (Ct.App. 1981). The right to sue and recover is therefore specifically limited to the rights, procedures, limitations, and conditions of the Act. Methola v. County of Eddy, 95 N.M. 329, 334, 622 P.2d 234, 239 (1980).
The dismissal of a complaint under SCRA 1986, 1-012(B)(6), is a legal determination. Johnson v. Francke, 105 N.M. 564, 734 P.2d 804 (Ct.App. 1987). In reviewing such a dismissal we accept as true facts well pleaded and question only whether the plaintiff can legally prevail under such facts. Gomez v. Board of Educ., 85 N.M. 708, 516 P.2d 679 (1973). Plaintiffs rely on the exceptions to the Act contained in Sections 41-4-9 and 41-4-10. We consider each claim separately.

*108 THE DEPARTMENT DID NOT PROVIDE HEALTH CARE SERVICES.
Plaintiffs argue, "To provide a foster home for a child is to provide a service to protect the health and general well being of a child." We cannot agree that the placement of a child in a foster home is the provision of "health care services" under Section 41-4-10, which provides:
The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees licensed by the state or permitted by law to provide health care services while acting within the scope of their duties of providing health care services.
In determining the meaning of "health care services" we must generally look to the ordinary, everyday meaning of such words. State ex rel. Reynolds v. Aamodt, 111 N.M. 4, 800 P.2d 1061 (1990). Ordinarily the term "health care services" would relate to those services provided by physicians, hospitals, and related health care practitioners. For purposes of the Medical Malpractice Act, NMSA 1978, §§ 41-5-1 to -28 (Repl.Pamp. 1989), our legislature has defined the similar term "health care provider" to mean "a person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant." § 41-5-3(A).
We specifically considered the meaning of "health care services" under the Act in Begay v. State, 104 N.M. 483, 723 P.2d 252 (Ct.App. 1985), rev'd on other grounds, 104 N.M. 375, 721 P.2d 1306, cert. denied, 479 U.S. 1020, 107 S.Ct. 677, 93 L.Ed.2d 727 (1986). In that case, relatives of the deceased brought suit against the New Mexico medical investigator for alleged negligence in performing an autopsy on the body. As in the instant case, the district court granted the defendants' motion to dismiss. This court affirmed, finding the medical investigator's performance of an autopsy was not a "health care service":
Section 41-4-10 provides a waiver for damages caused by public employees providing health care services. No cases are cited to support the argument that the action complained of falls within this waiver, but logic would support the proposition that the decision to perform an autopsy does not involve health care. No health care services were provided to Mr. Nelson nor to any of his family members. To allow plaintiffs to sue under any of these exceptions would be to read into the Act language which is not there. The right to sue state defendants is limited to those rights and conditions expressly presented in the Act.
104 N.M. at 487, 723 P.2d at 256.
Plaintiffs maintain that our interpretation of health care is too narrow. They argue that, because the Department is charged with providing for the health, safety, and welfare of the children under its care, and the provision of a foster home is one of the ways it fulfills this duty, placement in a foster home constitutes health care.
In an analogous context, the Wyoming Supreme Court rejected the argument now pressed by Plaintiffs. In Troyer v. State, Department of Health & Social Services, 722 P.2d 158 (Wyo. 1986), the Wyoming Division of Vocational Rehabilitation (the Division) agreed to help Troyer, who suffered from multiple sclerosis, select, install, and finance an elevator to his workshop. Because the initial bids exceeded the Division's budget, Troyer, at the Division's request, obtained a third bid, which was accepted. Id. at 159. The low bidder selected a winch displaying a warning which specifically cautioned that it was not to be used "for moving humans." This warning was cut off and the winch was used to construct the elevator. Id. While Troyer was sitting in his wheelchair in the elevator, the winch failed and the elevator fell. Troyer sued for the injuries he suffered, alleging a waiver of governmental immunity under the Wyoming tort claims statute for the "`negligence of health care providers *109 who are employees of the governmental entity while acting within the scope of their duties.'" Id. at 160 (quoting Wyo. Stat. Ann. § 1-39-110 (Cum.Supp. 1985)). The district court granted the Division's motion to dismiss the complaint. The Wyoming Supreme Court affirmed, specifically rejecting Troyer's argument that because "the elevator combatted his feelings of uselessness and thereby became a crucial part of his health care program," the Division employees who helped select, install, and finance the elevator became "health care providers." Id. at 161. Rather, that court found that the Wyoming legislature, in partially waiving that state's sovereign immunity, clearly intended to limit "health care providers" to those "who cure[] or prevent[] impairments of the normal state of the body." Id. We find the Wyoming court's logic persuasive.

THE DEPARTMENT DID NOT OPERATE A HOSPITAL, INFIRMARY, MENTAL INSTITUTION, CLINIC, DISPENSARY, MEDICAL CARE HOME, OR LIKE FACILITY.
Plaintiffs also argue that the placement of children in foster homes is the operation of a "like facility" under Section 41-4-9, which reads:
The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities.
Initially, we note that the Department did not "operate" the foster home which, in fact, belongs to Plaintiffs. See Armijo v. Department of Health & Env't, 108 N.M. 616, 775 P.2d 1333 (Ct.App. 1989) (department did not operate but only licensed transitional living unit); cf. Chee Owens v. Leavitts Freight Serv., Inc., 106 N.M. 512, 745 P.2d 1165 (Ct.App. 1987) (design, planning, and enforcement of bus safety rules were not "operation" of motor vehicle under Section 41-4-5).
Secondly, even if the Department "operated" the foster home (i.e., Plaintiffs' home), we do not think a foster home is "like" a hospital, infirmary, mental institution, clinic, dispensary, or medical care home. While this might seem obvious from the normal use of these phrases, we are further persuaded by the fact that the Arizona Court of Appeals rejected a similar contention in Sahf v. Lake Havasu City Ass'n for the Retarded & Handicapped, 150 Ariz. 50, 721 P.2d 1177 (Ct.App. 1986). In Sahf, the plaintiff sued for personal injuries sustained by her son as a result of alleged negligent care at a group home. The Arizona Department of Economic Security contracted with a private organization to provide residential living services to developmentally disabled persons like the plaintiff's son. Id. 150 Ariz. at 56, 721 P.2d at 1183. The plaintiff argued that the longer statute of limitations under the Arizona Medical Malpractice Act, Ariz. Rev. Stat. Ann. §§ 12-561 to -569 (1982), should apply because the provision of such residential services included general health and welfare functions and thus constituted "health care." Id. 150 Ariz. at 56-57, 721 P.2d at 1183-84. By providing health care services, the plaintiff argued, the private group home became a "licensed health care institution." Id. 150 Ariz. at 57, 721 P.2d at 1184. In affirming summary judgment for the state, the Arizona Court of Appeals rejected this logic, saying:
[The Arizona Department of Health Services] apparently recognizes that while some definitions of "health related services" are broad enough to encompass services provided for mentally retarded citizens in residential living institutions, the facilities themselves were not to be regarded as "health care institutions" for purposes of licensing requirements * * *.
* * * * * *
* * * The fact that occupants of a residence may from time to time become the victim [sic] of illness or accident does not convert that residence into a "health care institution" within either the meaning *110 of the Medical Malpractice Act or the Licensing Act.
Id. 150 Ariz. at 58, 721 P.2d at 1185.

CONCLUSION.
Plaintiffs appear to recognize the difficulties the statutory language poses for their arguments on appeal. They rely on the supreme court's decision in Miller v. New Mexico Department of Transportation, 106 N.M. 253, 741 P.2d 1374 (1987), and ask this court to read the relevant statutes in a manner "that facilitates their operation and the achievement of their goals." Id. at 255, 741 P.2d at 1376. We have tried to do so. In the end, however, we have to find the legislature's goals in the words the legislature chose or in the natural inferences from those words.
The waivers of immunity in Sections 41-4-9 and 41-4-10 do not allow suit based on allegations that a known child abuser was placed in a foster home by the Department. Plaintiffs maintain that finding the Department immune from suit would effectively deny these children any remedy. Their argument is forceful. However, it is not the function of the court of appeals to legislate. State ex rel. Rodriguez v. American Legion Post Post No. 99, 106 N.M. 784, 750 P.2d 1110 (Ct.App. 1987), cert. denied, 107 N.M. 16, 751 P.2d 700 (1988). Correction of whatever inequity exists in such a situation is best left to the legislature. Varos v. Union Oil Co., 101 N.M. 713, 688 P.2d 31 (Ct.App. 1984).
We affirm.
IT IS SO ORDERED.
HARTZ, J., concurs.
MINZNER, J., specially concurs.
MINZNER, Judge, specially concurring.
I concur in the majority's opinion, except that portion in which they discuss the applicability of NMSA 1978, Section 41-4-9 (Repl.Pamp. 1989). I agree with the majority that the phrase "negligence of public employees while acting within the scope of their duties in the operation of any hospital ... or like facilities" does not waive immunity on these facts, because the foster home was not a facility like the other institutions the section specifically lists. I am not persuaded that it was similar in function or risk of liability to the group of institutions within the ordinary meaning of the words used in Section 41-4-9. I conclude that applying the waiver of liability provided in Section 41-4-9 to Plaintiffs' complaint would not be a result the state should reasonably have anticipated in providing coverage. I think, however, that the discussion of the term "operation" and its applicability on these facts merits more discussion than the majority opinion contains.
The placement of a child in foster care within a private home involves the state in the lives of its citizens in a unique way. For example, regulations (not cited by Plaintiffs nor relied upon in their briefs) impose an obligation on the Human Services Department (Department) to advise foster parents of all relevant information concerning the child to be placed, accept liability for any property damage a child in foster care does to the foster home, and permit the foster parents to refuse a particular placement. See N.M. Human Servs. Dep't Substitute Care for Children  Procedures (SSD Procedures) PR 5.2.6.1.1; 5.3.5(D); 5.2.7.5 (1987). The regulations specifically provide that "[f]oster parents or other providers do not make independent plans for children in their care," PR 5.2.7.2, that "[t]he Department shall determine the most suitable arrangements for the child and plan for the child's protection, growth, development and education," PR 5.3.1, and allude to the agency's liability and that of the foster family if a foster child was placed in an unlicensed home or a home at licensing capacity and "something untoward happened to a child." PR 5.3.3.10; cf. SSD Procedures PR 5.3.24.2.3 (1989) (placement in an untrained, unlicensed foster home might result in a lawsuit "if anything happened to the child in care").
This regulatory scheme differs from that under review in Armijo v. Department of Health & Environment, 108 N.M. 616, 775 P.2d 1333 (Ct.App. 1989). In that case, we held that the Department of Health and *111 Environment (HED) did not operate a transitional living unit within the meaning of Section 41-4-9. In that case, the plaintiff contended that HED operated the facility because of the extensive regulatory scheme. We noted that the allegations were claims of malpractice and failure to warn and were based on HED's failure to "step into the clinical decision-making process" of the facility. Id. at 618, 775 P.2d at 1335. We held that HSD "did not regulate what is alleged to have caused plaintiff's injuries." Id. In this case, the regulations adopted by the Department do regulate what is alleged to have caused the injuries alleged in the complaint. Thus, I think Armijo is distinguishable.
However, the question is whether the Department's employees can be said to have been "acting within the scope of their duties in the operation of any hospital * * * or like facilities." § 41-4-9. I agree with the majority that on these facts the foster home was not a facility like a hospital. Thus, the damages alleged did not result from the negligence of its employees while acting within the scope of their duties in operating such a facility. The damages resulted from negligence in a different context, difficult to equate with the management of a health care facility because the Department's responsibilities are both broad and shared.
In Romero v. State, 112 N.M. 291, 814 P.2d 1019 (Ct.App.), rev'd on other grounds, 112 N.M. 332, 815 P.2d 628 (1991), we indicated that "`duties in the operation' does not encompass a duty to supervise the operation through regulation." Id. at 299, 814 P.2d at 1027. In overruling this court's opinion, the Supreme Court indicated that the Highway Department's own statutory responsibilities were within the meaning of "maintenance," stating that "`the greater supervisory responsibilities contemplated by [statute] included more than issuing regulations. Those responsibilities could have included supervising the county's actual day-to-day maintenance of the roadway.'" See Caillouette v. Hercules, Inc., 113 N.M. 492, 499, 827 P.2d 1306, 1313 (Ct.App. 1992) (quoting Romero v. State, 112 N.M. at 334, 815 P.2d at 630) (distinguishing Romero on the basis of the language quoted).
There is no comparable statutory scheme relevant to this case. The regulations appear to divide responsibility between foster parents and the Department for placement. Other decisions appear to be reserved by the Department. The placement decision in itself is not analogous to supervision of actual day-to-day operation, which under Romero might be equated with operation. On the other hand, unlike Chee Owens v. Leavitts Freight Serv., Inc., 106 N.M. 512, 745 P.2d 1165 (Ct.App. 1987), the Department for some purposes was "driving the bus." However, Plaintiffs have relied on the placement decision in framing their appellate argument.
Under these circumstances, I conclude that Plaintiffs' claim is not supported by the language of Section 41-4-9. Cf. Sahf v. Lake Havasu City Ass'n for the Retarded & Handicapped, 150 Ariz. 50, 721 P.2d 1177 (Ct.App. 1986) (private group home not a "health care institution"). Therefore, I join the majority in holding that Section 41-4-9 does not support Plaintiffs' claim, and thus in affirming the district court's decision dismissing Plaintiffs' complaint with prejudice.