694 A.2d 306

JAMES W. UNKERT, AN INCOMPETENT BY HIS GUARDIANS AD LITEM, DENNIS J. UNKERT AND SHIRLEY A. UNKERT, AND DENNIS J. UNKERT AND SHIRLEY A. UNKERT, INDIVIDU-ALLY, PLAINTIFFS–APPELLANTS, CROSS–RESPONDENTS, v. GENERAL MOTORS CORP., DEFENDANT–RESPONDENT, CROSS–APPELLANT. AND ROBERT A. ROGERS, DEFEN-DANT.

Superior Court of New Jersey
Appellate Division

Argued April 22, 1997—Decided June 4, 1997.

584

Before Judges DREIER, D'ANNUNZIO and NEWMAN.

*Robert A. Vort* argued the cause for appellants, cross-respondents (*Mr. Vort*, on the brief).

*Edward J. Fanning* argued the cause for respondent, cross-appellant (*Tansey, Fanning, Haggerty, Kelly, Convery & Murray*, attorneys; *Mr. Fanning*, of counsel and on the brief; *Sharon McConvery*, on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

On October 25, 1988, James Unkert was operating his Chevrolet pickup truck when his vehicle crossed into the oncoming lane and collided with a dump truck. James was immediately rendered unconscious as the result of severe head injuries, including an injury to his brain stem. The injuries rendered James incompetent, and he remains so to date. He resides in a rehabilitation institution.

On March 23, 1989, plaintiffs, James' parents, were granted letters of guardianship for James. The record suggests that this was done to facilitate the collection and administration of benefits on James' behalf, such as motor vehicle personal injury protection benefits. *N.J.S.A.* 39:6A–4.

On October 22, 1990, plaintiffs sued a hospital and various health professionals on James' behalf, alleging that their negligence had caused James to suffer from a severe condition of bedsores. That case was settled for $200,000 in August 1992.

On January 7, 1993, plaintiffs filed this action against General Motors Corp. (GM) alleging that James' truck was defective because it lacked head restraints on its seats, and that this defect contributed to James' head injuries.

GM moved for summary judgment on the ground that plaintiffs filed the complaint more than two years after the cause of action had accrued, and, therefore, it was barred by *N.J.S.A.* 2A:14–2, the two-year statute of limitations. The trial court granted the motion. It ruled that although *N.J.S.A.* 2A:14–21 tolls the limitations period for the duration of a person's "insanity," the statute of limitations began to run when plaintiffs were appointed James' guardians in January, 1989. Therefore, the complaint against GM, filed four years later in January 1993, was barred. The court memorialized its ruling in an order dated May 10, 1996. Plaintiffs appeal.

GM cross-appeals from an order dated September 9, 1994, denying its earlier motion for summary judgment. In that motion, GM contended that the entire controversy doctrine barred this action because it should have been asserted when plaintiffs filed the medical malpractice action.

We first address the statute of limitations issue. *N.J.S.A.* 2A:14–21 (section 21) provides:

If any person entitled to any of the actions or proceedings specified in sections 2A:14–1 to 2A:14–8 or sections 2A:14–16 to 2A:14–20 of this title or to a right or title of entry under section 2A:14–6 of this title is or shall be, at the time of any such cause of action or right to title accruing, under the age of 21 years, or insane,

such person may commence such action or make such entry, within such time as limited by said sections, after his coming to or being of full age or of sane mind.

The issue is whether section 21 applies in this case and, if so, whether the appointment of a guardian for an incompetent person triggers the running of the limitations period. The issue is one of legislative intent.

"In construing a statute we must effectuate the Legislature's intent." *Essex Crane Rental Corp. v. Director, Div. of Civil Rights*, 294 *N.J.Super.* 101, 105, 682 *A*.2d 750 (App.Div.1996) (citing *Monmouth County v. Wissell*, 68 *N.J.* 35, 43–44, 342 *A*.2d 199 (1975)). "[W]e must first look at the evident wording of the statute to ascertain its plain meaning and intent." *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 440, 435 *A*.2d 540 (1981). "Our duty is to apply the legislative intent as expressed in the statute's language, and we are not to presume that the Legislature intended something other than what it expressed by its plain language." *Essex Crane, supra*, 294 *N.J.Super.* at 105, 682 *A*.2d 750; *see In re Jamesburg High Sch. Closing*, 83 *N.J.* 540, 548, 416 *A*.2d 896 (1980); *In re Howell Township, Monmouth County*, 254 *N.J.Super.* 411, 419, 603 *A*.2d 959 (App.Div.), *certif. denied*, 127 *N.J.* 548, 606 *A*.2d 362 (1991).

In *Kyle v. Green Acres at Verona, Inc.*, 44 *N.J.* 100, 207 *A*.2d 513 (1965), our Supreme Court addressed section 21 and reviewed its history, tracing its antecedents to an English statute adopted during the reign of James I in 1623. *Id.* at 103, 207 *A*.2d 513. The Court construed section 21 to be inapplicable in cases where the "insanity" occurred after the cause of action accrued. The Court stated:

> From our historical analysis we conclude that [*N.J.S.A.* 2A:14–21] forecloses a tolling of the running of this statute of limitations unless plaintiff was within the prescribed categories at the time the cause of action accrued and that no 'time out' for the period of time covered by the disability is possible if the disability occurred after the cause of action accrued.
>
> [*Id.* at 106–07, 207 *A*.2d 513.]

The Court applied these principles to the claim before it, holding that the plaintiff, Kyle, could not benefit from section 21's

tolling provisions because "plaintiff could not be found to have become insane on the day of the accident." *Id.* at 107, 207 *A.*2d 513. The record established that Kyle had fallen at defendant's premises on January 21, 1957. She was adjudicated insane in October 1957. At her deposition, she testified that "it was the next day or two days" after the fall that she felt that the accident had affected her "nervous system." *Id.* at 102, 207 *A.*2d 513.

In discussing the applicability of section 21 to Kyle's claim, the Court referred to *Nebola v. Minnesota Iron Co.,* 102 *Minn.* 89, 112 *N.W.* 880 (1907), in which the Minnesota Supreme Court "adopted the rule which has been followed by a limited number of jurisdictions that when the injury and the resulting insanity occur on the same day, the two events will be considered legally simultaneous and the statute will not begin to run until sanity is restored." *Kyle, supra,* 44 *N.J.* at 107, 207 *A.*2d 513. The *Kyle* Court, however, determined that *Nebola* would not apply because "plaintiff could not be found to have become insane on the day of the accident." *Ibid.*

*Kyle* aids our construction of section 21 in the present case. In *Kyle* the Court engaged in a literal application of section 21's language, which requires that the disability exist "at the time of any such cause of action ... accruing." We are not bound, however, by *Kyle*'s determination that section 21's benefits were not available to the plaintiff in that case because the present case is factually distinguishable. In the present case, unlike in *Kyle,* James' incompetence occurred simultaneously with the accrual of his alleged cause of action against GM.

In a similar case, *Sobin v. M. Frisch & Sons,* 108 *N.J.Super.* 99, 260 *A.*2d 228 (App.Div.1969), *certif. denied,* 55 *N.J.* 448, 262 *A.*2d 702 (1970), we held that the simultaneous occurrence of injury and unconsciousness, which persisted for 100 days, fell within section 21's tolling provisions. There, we stated:

The facts before us establish conclusively that John's unconsciousness (insanity) occurred simultaneously with the injuries he suffered and, therefore, simultaneously with the accrual of his cause of action against both defendants. Under these circumstances, he must be regarded as having been "insane" at the time that such

cause of action accrued. *N.J.S.A.* 2A:14–21. In our view, to read the words "... is or shall be, at the time of any such cause of action ... accruing ... insane", to be applicable only if John could be found to have been insane a split-second before he hit the ground would amount to nothing more than casuistry. *Cf. Nebola v. Minnesota Iron Co.,* 102 *Minn.* 89, 112 *N.W.* 880 (1907); *City of Miami Beach v. Alexander,* 61 *So.*2d 917 (Fla.Sup.Ct.1952); compare *Roelefsen v. Pella,* 121 *Iowa* 153, 96 *N.W.* 738 (Sup.Ct.1903); *Taylor v. Houston,* 93 *U.S.App. D.C.,* 391, 211 *F.*2d 427, 41 *A.L.R.*2d 724 (1954).

[*Id.* at 105, 260 *A.*2d 228.]

The Court, in *Kyle,* also addressed the meaning of "insane" as used in section 21. The Court concluded "that 'insane' in the statute of limitations means such a condition of mental derangement as actually prevents the sufferer from understanding his legal rights or instituting legal action." *Id.* at 113, 207 *A.*2d 513. In *Sobin, supra,* 108 *N.J.Super.* at 104, 260 *A.*2d 228, we observed that section 21's use of the word "insanity" referred to a person "who actually lacks the ability and capacity, due to mental affliction, to pursue his lawful rights." There, we held that a plaintiff's "unconsciousness" for one hundred days "rendered him 'insane' as that word is used in *N.J.S.A.* 2A:14–21...." *Ibid.*

In the present case, we conclude that James' incompetence rendered him "insane" within the meaning of section 21 and that section 21 tolled the running of the statute of limitations because James' incompetence and the accrual of his alleged cause of action occurred simultaneously.

The trial court determined, however, that the appointment of James' parents as guardians terminated section 21's tolling provision and started the running of the two year statute of limitations. *See N.J.S.A.* 2A:14–2. We disagree. As previously indicated, *Kyle* applied section 21's language literally in requiring that the plaintiff's insanity, though caused by the injury, exist when the cause of action accrues. We perceive no reason to deviate from section 21's language. It starts the limitation period running "after [the injured person's] coming to or being of full age or of sane mind." *N.J.S.A.* 2A:14–21. The statute does not provide that the appointment of a guardian for an insane person triggers the running of the limitations period. Although we have

found no New Jersey opinion regarding the issue in an analogous situation, we are confident that the appointment of a guardian for an infant would not neutralize section 21 and trigger the beginning of a limitation period.

GM relies on *Kyle, supra,* contending that *Kyle* requires commencement of an action within a reasonable time after the appointment of a guardian. Although the Court in *Kyle* did so rule, GM's reliance on that ruling in the present case distorts the context in which it was made.

As indicated, the Court in *Kyle* determined that section 21 did not apply because *Kyle's* insanity occurred after her cause of action had accrued. The Court, however, deemed it inequitable to bar plaintiff's cause of action if defendant's wrongful act caused Kyle's insanity. In that case, defendant "was responsible for plaintiff's failure or inability to institute her action prior to the running of the statute of limitations." *Kyle, supra,* 44 *N.J.* at 111, 207 *A.*2d 513. The Court summarized its holding in this regard:

> The equitable approach should mandate the following: A trial court shall itself without a jury hear and determine (1) whether insanity developed on or subsequent to the date of the alleged act of defendant and within the period of limitation and if so, whether that insanity resulted from the defendant's acts; and (2) whether plaintiff's suit was started within a reasonable time after restoration of sanity or after the appointment of a guardian or committee who knew or should have known of the cause of action. If the trial court finds for plaintiff, the statute of limitations shall be barred as a defense.
>
> [*Id.* at 112, 207 *A.*2d 513.]

It is apparent, therefore, that the Court's ruling in *Kyle,* upon which GM relies in the present case, was constructed outside section 21, which the Court had determined to be inapplicable.

GM's reliance on *Kisselbach v. County of Camden,* 271 *N.J.Super.* 558, 638 *A.*2d 1383 (App.Div.1994), is misplaced. There, we held that the existence of a power of attorney in favor of the incompetent's son did not render section 21 inapplicable. The statement regarding the impact of a guardianship on section 21's tolling provisions was dictum. *Id.* at 566, 638 *A.*2d 1383.

We are cognizant of the principle that "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" *Schierstead v. City of Brigantine,* 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (citations omitted). Moreover, in construing a statute, we assume that the Legislature intended a reasonable approach, and the statute should be construed to effect a reasonable approach. *Roman v. Sharper,* 53 *N.J.* 338, 341, 250 *A.*2d 745 (1969). We are persuaded that the application of these principles does not mandate neutralization of section 21 upon appointment of a guardian. Reasonable arguments can be marshalled in favor of such a rule. *See First–Citizens Bank & Trust Co. v. Willis,* 257 *N.C.* 59, 125 *S.E.*2d 359, 361 (1962). However, it would be contrary to section 21's language, and would ignore the fact that so long as the injured party remains incompetent, he is unable to assist in the preparation and presentation of his case. *See O'Brien v. Massachusetts Bay Transp. Auth.,* 405 *Mass.* 439, 541 *N.E.*2d 334, 335 (1989) (holding "that the Legislature had in mind, not merely the inability to sue, but also the difficulties of the incompetent in giving information and in testifying."). We conclude, therefore, that the continued application of section 21 despite the appointment of a guardian does not violate "standards of reasonableness or common sense, or lead to an absurd or anomalous result." *Essex Crane, supra,* 294 *N.J.Super.* at 107, 682 *A.*2d 750.

Finally, we note that according to our research the majority of jurisdictions that have addressed the issue hold that the appointment of a guardian does not trigger the commencement of the limitations period. *Freeman v. Alex Brown & Sons, Inc.,* 73 *F.*3d 279, 281–82 (10th Cir.1996); *Desert State Life Management Servs. v. Assoc. of Retarded Citizens,* 939 *F.Supp.* 835, 838 (D.N.M.1996); *McGuinness v. Cotter,* 412 *Mass.* 617, 591 *N.E.*2d 659, 663 (1992); *Barton–Malow Co., Inc. v. Wilburn,* 556 *N.E.*2d 324, 325 (Ind. 1990); *O'Brien, supra,* 541 *N.E.*2d at 335; *Young v. Key Pharmaceuticals, Inc.,* 112 *Wash.*2d 216, 770 *P.*2d 182, 186–87 (1989); *Sahf v. Lake Havasu City Ass'n,* 150 *Ariz.* 50, 721 *P.*2d 1177, 1181–82

(App.1986); *Emerson v. Southern Ry. Co.*, 404 *So.*2d 576, 579 (Ala.1981); *Whalen v. Certain–Teed Prod. Corp.*, 108 *Ga.App.* 686, 134 *S.E.*2d 528, 529–30 (1963); *Mason v. Sorrell*, 260 *Ark.* 27, 551 *S.W.*2d 184 (1976); *Kiley v. Jennings, Strouss & Salmon*, 187 *Ariz.* 136, 927 *P.*2d 796, 799 (App.1996); *Paavola v. Saint Joseph Hosp. Corp.*, 119 *Mich.App.* 10, 325 *N.W.*2d 609, 610 (1982); *see* M.C. Dransfield, Annotation, *Limitation–Running Against Ward,* 86 *A.L.R.*2d 965 (1962).

In *Sahf, supra,* 721 *P.*2d at 1182, the court held that to condition the tolling of a statute (similar to *N.J.S.A.* 2A:14–21) upon the appointment of a guardian would "constitute unjustifiable tampering with the significant public policy clearly reflected in the [tolling statute] the protection and preservation of substantive rights of mentally incompetent persons." (quoting *Paavola, supra,* 325 *N.W.*2d at 611). Additionally, in *Freeman, supra,* 73 *F.*3d at 281, and *Barton–Malow Co., Inc., supra,* 556 *N.E.*2d at 325, the courts held that given that their respective tolling statutes provided no exceptions for the appointment of a guardian, the court could not graft such an exception onto the statute. *See Sahf, supra,* 721 *P.*2d at 1182. *But see Zator v. State Farm Mut. Auto. Ins. Co.*, 69 *Haw.* 594, 752 *P.*2d 1073, 1075–76 (1988); *First–Citizens Bank & Trust Co., supra,* 125 *S.E.*2d at 361; *cf. Clifford v. United States,* 738 *F.*2d 977, 980 (8th Cir.1984).

We hold that section 21 tolled the limitations period and that it did not begin to run on the appointment of James' guardians. Consequently, the judgment against plaintiffs is reversed.

Regarding GM's cross-appeal from the denial of its motion to dismiss on entire-controversy grounds, we affirm substantially for the reasons expressed in the motion judge's oral opinion. We add the following additional observations.

The entire controversy doctrine evolved through common law to encompass a mandatory rule "for the joinder of virtually all causes, claims, and defenses relating to a controversy between the parties engaged in litigation." *Cogdell v. Hosp. Ctr. at Orange,*

116 *N.J.* 7, 16, 560 *A*.2d 1169 (1989); *see Ajamian v. Schlanger,* 14 *N.J.* 483, 488, 103 *A*.2d 9, *cert. denied,* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954). The doctrine is now codified in *R.* 4:30A, which provides:

> Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by *R.* 4:64–5 (foreclosure actions) and by *R.* 4:67–4(a) (leave required for counterclaims or cross-claims in summary actions).

The purposes of the doctrine are several—judicial economy, efficiency, avoidance of waste, the reduction of delay, fundamental fairness to parties, avoidance of piecemeal litigation and harassment of parties—but they are often reduced to two when referring to the overriding policy behind the doctrine: fairness to parties and judicial economy. *Cogdell* 116 *N.J.* at 15, 17, 560 *A*.2d 1169. In *Cogdell,* the Court extended the doctrine to require the mandatory joinder of all *parties* "who have a material interest in the controversy." *Id.* at 26, 560 *A*.2d 1169.

Application of the doctrine, however, is not automatic. We so noted in *DiTrolio v. Antiles,* 276 *N.J.Super.* 234, 647 *A*.2d 1318 (App.Div.1994), *certif. denied,* 140 *N.J.* 275, 658 *A*.2d 299 (1995), when we stated:

> The common perception running through all of these cases, as well as *Cogdell* itself, is that the entire controversy doctrine is not to be applied automatically to preclude a subsequent suit simply because claims between identical parties not pleaded in an earlier action were raised in a subsequent suit or because the defendants in the later suit had some interest in the issues raised in the prior action. Rather, in common with other discretionary standards, a particularized evaluation is required to determine whether policies sought to be fostered by the doctrine require its application as a preclusive principle when balanced against a litigant's right to tailor separate causes of action in ways that do not impose substantial unfairness upon other parties, unreasonably fragment litigation or negate the fair demands of judicial economy or efficiency. *See Cogdell, supra,* 116 *N.J.* at 22–24, 560 *A*.2d 1169. This is evident from the fact that the Supreme Court framed the question addressed in *Cogdell* in terms of the equality of the defendants' interests in the earlier litigation and whether the second suit was effectively part of "the same legal controversy." *Id.* at 15, 560 *A*.2d at 1171.

[*Id.* at 247–48, 647 *A*.2d 1318.]

Moreover, in *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 142 *N.J.* 280, 290, 662 *A.*2d 509 (1995), the Supreme Court observed that application of entire-controversy principles is discretionary based on equitable considerations.

In the present case, we perceive no abuse of the trial court's discretion in not applying the doctrine. The claim for James' bedsores was a discrete claim. Although there was a "but for" relationship between James' bedsores and his collision injuries, we perceive no unfairness to GM from plaintiffs' failure to join it in the malpractice litigation. Additionally, we doubt that such a joinder would have advanced the interest of judicial economy.

On GM's cross-appeal, the order denying GM's motion to dismiss is affirmed. On plaintiffs' appeal, the judgment against plaintiffs is reversed. The case is remanded for further proceedings.