IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2013-NMSC-005

Filing Date: January 31, 2013

Docket No. 33,083

ESTELA MARTINEZ and LILA SALAZAR, individually
and as co-personal representatives of the ESTATE OF
NATALIE MARTINEZ ESPINOZA, ISAAC MARTINEZ,
and ESTELA MARTINEZ, individually and as co-personal
representatives of the ESTATE OF AMELIA D. MARTINEZ,
LILA SALAZAR and DONNA SALAZAR, as co-personal
representatives of the ESTATES OF DONALD D. ESPINOZA,
TONY ESPINOZA, and EDNA ESPINOZA, and ANTHONY
MARK ESPINOZA, individually,

        Plaintiffs-Petitioners,

v.

NEW MEXICO DEPARTMENT OF TRANSPORTATION,

        Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Timothy L. Garcia, District Judge

Hemphill & Grace, P.C.
Linda G. Hemphill
Paul W. Grace
Santa Fe, NM

The Okon Law Firm
Christa M. Okon
Santa Fe, NM

for Petitioners

Cuddy & McCarthy, L.L.P.
Mary Karen Kilgore
Evelyn Anne Peyton
Santa Fe, NM

1

for Respondent

Michael B. Browde
Albuquerque, NM

for Amicus Curiae New Mexico Trial Lawyers Association

Gary K. King, Attorney General
Matthew Eric Jackson, Assistant Attorney General
Santa Fe, NM

for Amicus Curiae New Mexico Attorney General Gary K. King

**OPINION**

**BOSSON, Justice**

{1}     New Mexico State Road 502 (NM 502), a winding mountainous roadway leading to and from Los Alamos, New Mexico, was designed partially with and partially without center lane barriers to prevent cross-over collisions. Barriers were not installed at the site of the cross-over collision in this case. The New Mexico Department of Transportation (DOT), which has legal responsibility to maintain NM 502, was sued for negligently failing to remedy a dangerous condition when it chose not to replace the open center lane with cross-over barriers, after it was allegedly put on notice of that risk by post-construction accidents and other events. Our Court of Appeals held as a matter of law that DOT was immune from suit for such negligence, a decision which we reverse as being at odds with our jurisprudence. We also hold that the district court unduly restricted the evidence offered to show that DOT had received notice of the danger at this location and the need for remedial action. Accordingly, we reverse and remand for a new trial.

**BACKGROUND**

{2}     On December 9, 2004, Amelia Martinez and Donald Espinoza were driving west on NM 502 toward Los Alamos to buy a car. Amelia, eight and a half months pregnant at the time, was driving and Donald was in the passenger seat. Tragically, they did not make their destination.

{3}     At the same time, Anthony Griego was driving east on NM 502 away from Los Alamos. Griego was weaving in and out of traffic, passing cars in both the left- and right-hand lanes. In an attempt to pass another car, Griego entered the center turn lane, a two-way, turn-only lane near mile marker 9. Griego lost control of his vehicle in the center turn lane, which was covered in red crushed cinder commonly used in New Mexico during snow-clearing operations. He skidded into oncoming traffic, colliding head-on with Amelia's vehicle. No one from either vehicle survived the crash. A toxicology report later showed

2

that Griego had both drugs and alcohol in his system at the time of the collision.

**{4}**     The parents of both Amelia and Donald, as well as Donald's grandparents, (Plaintiffs) filed the present suit against DOT, claiming wrongful death and loss of consortium. Plaintiffs alleged that the failure to construct a center barrier on this section of NM 502 "created or permitted a dangerous condition to exist, [and] constitutes a failure to maintain a road in a reasonably safe condition for which immunity has been waived under the Tort Claims Act." In addition, DOT "permitted a dangerous condition by allowing sand or gravel to remain in the [center lane]."

**{5}**     DOT had redesigned NM 502 in the late 1980s. The redesign was necessary to accommodate increased traffic flow and to make the road safer "due to the sensitive materials which may be taken to and from the Los Alamos National Laboratory," presumably a reference to transporting nuclear waste. As part of the redesign, an additional lane of travel was added in each direction. The redesign included a center turn lane between mile markers 8 and 10 where the cross-over collision occurred, although with the exception of a gas station, there are no developed roadways upon which to turn. West of mile marker 8, the eastbound and westbound lanes of traffic are divided by a concrete median barrier known as a "Jersey barrier." Between mile markers 8 and 10, including the collision site, there is no Jersey barrier.

**{6}**     Before trial, DOT filed a motion for partial summary judgment regarding waiver of immunity under the New Mexico Tort Claims Act (the Act). As will be discussed in more detail, the Act permits suits against DOT for negligent "maintenance" of a roadway, but not for negligent "design." NMSA 1978, § 41-4-11 (1991). The summary-judgment motion asked the district court to rule as a matter of law that DOT's decision not to install a center barrier in the area where this collision occurred was one of design, not maintenance. The district court granted the motion and, as such, prevented Plaintiffs from going to trial under their theory that a failure to install a center barrier on this particular stretch of roadway constituted negligent maintenance. The ruling thus limited Plaintiffs' claim at trial to proving that DOT was negligent for failing to remove the red cinder left from snow-clearing operations that had accumulated in the center turn lane, a proximate cause of the collision.

**{7}**     At trial, Plaintiffs sought to introduce evidence of other cross-median, fatal collisions that had occurred between mile markers 8 and 10, the stretch of road with the center turn lane at issue in this case. Between 1998 and the time of this collision, five other motorists had died in four separate incidents involving cross-median collisions between mile markers 8 and 10. The district court excluded evidence of these fatalities.

**{8}**     In addition to evidence of other collisions, Plaintiffs attempted unsuccessfully to introduce two types of evidence: one, that citizens had previously filed complaints with DOT regarding the lack of a center barrier, and two, that DOT had installed a center barrier on other sections of the road. The court limited the evidence at trial to the scene of the collision and evidence regarding red cinder in the center turn lane.

**{9}** So restricted, Plaintiffs proceeded to trial where the jury returned a verdict for DOT. The Court of Appeals affirmed the district court in total. *Martinez v. N.M. Dep't of Transp.*, 2011-NMCA-082, 150 N.M. 204, 258 P.3d 483. The Court of Appeals focused on the permanent nature of Jersey barriers, describing them as "concrete, dense structures, the placement of which is not simple or uncomplicated." *Id.* ¶ 18. According to the Court of Appeals, New Mexico jurisprudence "hinged on the difference between guiding traffic and designing permanent attributes of a road itself." *Id.* ¶ 17. Ultimately, the Court of Appeals held "that erection of permanent barriers as part of a road constitutes a matter of road design" and not maintenance. *Id.* We granted certiorari to consider important legal issues—both for the motoring public and for DOT in discharging its responsibility to ensure the safety of New Mexico's highways—that arise from a proper interpretation and application of the Tort Claims Act.

## DISCUSSION

### Standard of Review

**{10}** As we interpret the Act, we are reminded that statutory construction is a matter of law which is our responsibility to review de novo. *See Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 8, 133 N.M. 756, 69 P.3d 1199 ("The standard of review for determining whether governmental immunity under the [Act] bars a tort claim is a question of law which we review de novo.").

### Tort Claims Act

**{11}** The Tort Claims Act, passed by the Legislature in 1976, affirmed the sovereign immunity of the State from tort claims generally, subject to certain frequently discussed exceptions. NMSA 1978, § 41-4-2 (1976). The Act was intended to balance "the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity" with the observation that "the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done." Section 41-4-2(A). Accordingly, the Legislature declared it "to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." *Id.*

**{12}** Of the exceptions explicitly enumerated in the Act, Section 41-4-11 waives immunity for certain actions regarding highways. The statute reads as follows:

> A. The *immunity* granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does *not* apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties during the

4

construction, and in subsequent *maintenance* of any bridge, culvert, *highway*, roadway, street, alley, sidewalk or parking area.

        B.      The liability for which immunity has been waived pursuant to Subsection A of this section shall *not* include liability for damages caused by:

           (1)     a *defect in plan or design* of any bridge, culvert, *highway*, roadway, street, alley, sidewalk or parking area;

           (2)     the failure to construct or reconstruct any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area . . . .

*Id.* (emphasis added). The central issue in this case is whether DOT's decision not to install a post-construction center barrier at mile marker 9 on NM 502, after being alerted of a potentially dangerous condition at that general location, is a matter envisioned by the Act as highway "maintenance," for which sovereign immunity is waived, or highway "design," for which it is not.

**The Court of Appeals' Narrow Definition of Maintenance**

**{13}** When the Act was originally passed in 1976, it did not define the term "maintenance." *See* 1976 N.M. Laws, ch. 58, § 3. Thus, it was up to New Mexico courts to determine what the Legislature intended that term to mean. Through the years, maintenance has been interpreted very broadly. *Romero v. State*, 112 N.M. 291, 296, 814 P.2d 1019, 1024 (Ct. App. 1991), *rev'd in part on other grounds by Romero v. State*, 112 N.M. 332, 333, 335, 815 P.2d 628, 629, 631 (1991), *abrogated on other grounds by Dunleavy v. Miller*, 116 N.M. 353, 356 n.1, 862 P.3d 1212, 1215 n.1 (1993).

**{14}** Perhaps the broadest interpretation of the term is found in this Court's opinion in *Miller v. New Mexico Department of Transportation*, 106 N.M. 253, 741 P.2d 1374 (1987), *superseded by statute*, NMSA 1978, Section 41-4-3(E)(1) (1995) (pursuant to 1991 amendment, 1991 N.M. Laws, ch. 205, § 1). In *Miller*, this Court held that the issuance of oversize vehicle permits could constitute highway maintenance for which DOT could be sued under the Act. *Id.* at 255, 741 P.2d at 1376. The Legislature responded by amending the Act, providing its first definition of maintenance and effectively overruling *Miller*. *See Rutherford*, 2003-NMSC-010, ¶ 21.

**{15}** Though the Legislature repudiated our holding in *Miller*, it did so narrowly. *Rutherford*, 2003-NMSC-010, ¶ 21. The Legislature added a definition of what should not be considered maintenance:

"maintenance" does not include:

5

> (1) conduct involved in the issuance of a permit, driver's license or other official authorization to use the roads or highways of the state in a particular manner; or
>
> (2) an activity or event relating to a public building or housing project that was not foreseeable.

NMSA 1978, § 41-4-3(E) (2009). Thirteen years later, when this Court analyzed the *Miller* amendment in *Rutherford*, we concluded that "the legislative amendment was narrow, calculated, and [it] addressed the particular legal conclusion in *Miller*." 2003-NMSC-010, ¶ 21. Because the matter before us does not pertain to permits or anything else discussed in the *Miller* amendment, that statutory definition of maintenance offers little help in this particular case.

**{16}**    The *Rutherford* opinion was our last occasion to interpret the meaning of maintenance; the importance of its holding should not be underestimated. There, the plaintiff sued DOT after attempting to drive his vehicle across a flooded arroyo. *Id.* ¶ 3. The road was designed to pass through the arroyo instead of passing over it by bridge, and signs were posted at the crossing warning motorists to "'WATCH FOR WATER.'" *Id.* ¶ 2. Normally, when the arroyo flooded, the Chaves County Road Department would close the crossing using portable barricades which prevented motorists from driving into the flood waters. *Id.* Before the barricades could be put in place, however, Rutherford attempted to cross the flooded arroyo, and as a result his wife, their two children, and another child drowned. *Id.* ¶ 3.

**{17}**    This Court had to decide whether placing barricades to stop motorists from crossing the arroyo—and more importantly the County's lack of a prompt response to adverse weather conditions that threatened the motoring public—constituted roadway maintenance under the Act. *Id.* ¶ 10. In analyzing a long line of New Mexico cases, we reaffirmed "that traffic controls constitute maintenance activities under the [Act]." *Id.* ¶ 9. *See, e.g.*, *Pollock v. State Highway & Transp. Dep't*, 1999-NMCA-083, 127 N.M. 521, 984 P.2d 768 (holding that placing a "Do Not Enter" sign was maintenance); *Rickerson v. State of N.M. & City of Roswell*, 94 N.M. 473, 612 P.2d 703 (Ct. App. 1980) (holding that replacing a stop sign with a traffic signal was maintenance).

**{18}**    Much as DOT does today, Chaves County argued for a narrower, more restrictive definition of maintenance based on the *Miller* amendment. 2003-NMSC-010, ¶ 18. We recognized that the Legislature repudiated *Miller*'s holding. *Id.* ¶ 21. But, we concluded that the Legislature did nothing to narrow the definition of maintenance outside of the context of our opinion in *Miller*. *Id.* Accordingly, we rejected then, as we do today, any suggestion that the State's duty to maintain roadways in a safe condition for the benefit of the public has been diluted or narrowed beyond the text of the 1991 legislative amendment. *Id.*

6

**{19}**    Specifically, we said in *Rutherford* that maintenance was *not* confined to mere "'upkeep and repair,'" which is vital to our review of the Court of Appeals' opinion in the instant case. *Id.* We stated, "In 1991, when considering the definition of 'maintenance,' the Legislature chose not to limit the meaning of the term 'maintenance' to 'upkeep and repair.' Notably, the Legislature also did not define maintenance to exclude traffic control." *Id.*

**{20}**    Despite what we said in *Rutherford*, the Court of Appeals' opinion in the present case closely aligned the meaning of maintenance with upkeep and repair. *Martinez*, 2011-NMCA-082, ¶ 11. Relying on one of its prior opinions, the Court of Appeals observed that "[i]n *Villanueva*, we reaffirmed that '*maintenance*' of a road involves 'upkeep and repair,' and our view that installations of structural elements are matters for which design immunity is conferred." *Id.* (alteration omitted) (quoting *Villanueva v. City of Tucumcari*, 1998-NMCA-138, ¶ 8, 125 N.M. 762, 965 P.2d 346). The proper scope of the term maintenance in a case such as this was previously articulated by the Court of Appeals in *Jacobo v. City of Albuquerque*, 2005-NMCA-105, 138 N.M. 184, 118 P.3d 189, where the Court accurately quoted our specific holding from *Rutherford*—"New Mexico cases have held that the term 'maintenance' is not limited to 'upkeep and repair' but that 'the identification and remediation of roadway hazards constitutes highway maintenance under Section 41-4-11 of the [Act].'" *Id.* ¶ 15 (quoting *Rutherford*, 2003-NMSC-010, ¶¶ 21, 25). We reject, as we did in *Rutherford*, any statutory construction that would limit the word maintenance to upkeep and repair.

**{21}**    We emphasize, as we will discuss again in the coming paragraphs, that the term maintenance requires a reasonable response to a known dangerous condition on a roadway. When the reasonableness of that response pertains to traffic controls, it is not measured just by size or weight, permanence or mobility, whether the defect is a structural element or is more transitory in nature.

**Remediation Measures Are Maintenance**

**{22}**    In this case, the Court of Appeals noted that "[e]rected Jersey barriers are concrete, dense structures, the placement of which is not simple or uncomplicated," and distinguished the barriers at issue in *Rutherford* because they could be "placed on and removed from the road as needed." *Martinez*, 2011-NMCA-082, ¶ 18. In so doing, the Court of Appeals was led astray by DOT.

**{23}**    The fallacy of this argument is straightforward. A traffic signal is also a permanent and substantial feature on a roadway. Once placed, a traffic signal is generally not removed and becomes a permanent fixture of the intersection. The placement of a traffic signal "is not simple or uncomplicated." *Id.* Traffic studies must be conducted over a period of time to determine the appropriateness of such a change, not to mention the construction which ultimately results in a permanent "concrete, dense structure[]." *Id.* Yet the Court of Appeals acknowledged that installing a traffic signal constitutes maintenance under the Act. *Id.* ¶ 15.

7

**{24}** Plaintiffs further argued that other, less substantial remedial measures could have prevented the collision in this case. In addition to Jersey barriers, Plaintiffs argued that the collision could have been prevented "by installing cable barriers or by erecting a concrete or grassy island." The Court of Appeals opinion does not address these additional remedial measures. With the opinion focused, at least in part, on substantiality, we are left to wonder whether cable barriers are substantial enough to be considered design under the Court of Appeals' analysis.

**{25}** Rather than focusing on what DOT was being asked to do—remedy a dangerous condition—the Court of Appeals was distracted by the sheer size or weight of the proposed remedy, a distinction absent from the text of the Act. The Court focused more on the distinguishing characteristics of a center barrier versus a stoplight versus a sign warning of animals crossing, rather than the overarching principle enunciated in both the Act and in our case law—the need for action to remedy a dangerous condition on a roadway.

**{26}** The duty to maintain a roadway subsumes within it a duty to remediate a known, dangerous condition, regardless of whether the source of that danger can be traced back to a design feature. If not our specific holding in *Rutherford*, it is at the very least a strong inference from what we said in that opinion. Its roots in New Mexico jurisprudence can be traced back as far back as 1980. Although these prior cases do not have the same explicit holding as *Rutherford*, implicit in them is the legal conclusion that the duty to remedy a dangerous condition falls within the intended meaning of maintenance under the Act. We discuss a selection of these cases to illustrate the point.

**{27}** *Rickerson* was the earliest of these cases. The plaintiff argued that a particular intersection was dangerous due to a lack of sufficient traffic controls, such as a stoplight. 94 N.M. at 475, 612 P.2d at 705. The State argued that it was immune from suit because the layout of the intersection was a design issue; the intersection as designed did not call for a stoplight. *Id.* The Court of Appeals held that immunity was waived under both Section 41-4-11(A) and NMSA 1978, Section 41-4-6 (2007) (waiving immunity for negligent operation of equipment), and accordingly, the question of the State's negligence should go to a jury. *Rickerson*, 94 N.M. at 475-76, 612 P.2d at 705-06. More important to our analysis in this case than the holding is Judge Sutin's special concurrence.

**{28}** In his special concurrence, Judge Sutin makes clear that the duty to correct a dangerous condition, even if it resulted from the original design, falls under the maintenance waiver of the Act. Specifically, he notes that the original design of the road, in that case "[t]he presence of stop signs [rather than a stop light] to control traffic on a street before entering an intersection does not absolve a government entity of liability where a dangerous condition has been created." *Id.* at 477, 612 P.2d at 707 (Sutin, J., specially concurring). In addition, Judge Sutin opined,

> What is meant by "maintenance of a street"? To me, it is logical to conclude
> that, since "defect in plan or design of a street" appears in the same section

8

with "maintenance of a street," "maintenance of a street" includes within its perimeter or scope, an improvement of the "plan or design."

*Id.* at 479, 612 P.2d at 709 (Sutin, J., specially concurring). We agree.

**{29}** Two years later, a unanimous panel of the Court of Appeals endorsed Judge Sutin's belief that the duty to mitigate a dangerous condition falls under the state's maintenance obligations for the purposes of the Act. In a case very similar to *Rickerson*, the Court of Appeals once again ruled that the state was not immune under the Act for failing to install traffic signals and signs. *See Blackburn v. State*, 98 N.M. 34, 36, 644 P.2d 548, 550 (Ct. App. 1982).

**{30}** In *Blackburn*, the discussion of "dangerous conditions" arose in the context of a dispute over jury instructions. The plaintiff complained of the following jury instruction:

> Plaintiff's cause of action against defendants, State of New Mexico, State Highway Department and State Engineer, is based upon and must meet the requirements of the law relating to the liability of a public entity for a dangerous condition of public property.
>
> Before the plaintiff may be entitled to your verdict under this law, against defendants, State of New Mexico, State Highway Department and State Engineer, you must find from a preponderance of the evidence:
>
> First: That Intersection at State Road 85, State Road 6 in Los Lunas, New Mexico was in a dangerous condition on April 14, 1979;
>
> Second: That the injury of which plaintiff complains was proximately caused by the dangerous condition;
>
> Third: That the injury occurred in a way which was reasonably foreseeable as a consequence of the dangerous condition of the property; and
>
> Fourth: That either:
>
> (a) The dangerous condition was created by a negligent or wrongful act or omission of an employee of the defendants, State of New Mexico, State Highway Department and State Engineer, acting within the scope of his employment, or
>
> (b) The defendants, State of New Mexico, State Highway Department and State Engineer, had actual or constructive notice of the dangerous condition a sufficient time prior to the time of the accident so that measures could have been taken to protect against the dangerous condition.

*Id.* at 37, 644 P.2d at 551.

**{31}** The jury instruction explicitly defines the duty owed by the state as the duty to remedy a dangerous condition. The Court of Appeals concluded that this instruction "fairly present[s] the applicable law" and that the instruction "was a correct statement of New Mexico law." *Id.* Implicit in this reasoning is that a duty to remedy a dangerous condition is a maintenance obligation for which immunity is waived under the Act.

**{32}** Subsequently, in *Ryan v. New Mexico State Highway & Transportation Department*, the Court of Appeals held that the failure to install a sign warning of animal crossings fell under the state's maintenance obligations, and therefore immunity was waived. *See* 1998-NMCA-116, ¶ 5, 125 N.M. 588, 964 P.2d 149. It was the duty to mitigate the dangerous condition—warn motorists of the possibility of animals in the roadway—that triggered the need for maintenance and thus the waiver of sovereign immunity. *Id.*

**{33}** Thus, the duty to remedy a dangerous condition on New Mexico highways is nothing new under New Mexico law generally and under the Tort Claims Act specifically. *See Castillo v. Cnty. of Santa Fe*, 107 N.M. 204, 206-07, 755 P.2d 48, 50-51 (1988) (recognizing that the duty to remedy a dangerous situation constitutes maintenance under Section 41-4-6, which waives immunity for operation or maintenance of buildings). A dangerous condition can result from the original design of the highway as long as the state has sufficient notice of the danger and the need for remediation. *Rickerson*, 94 N.M. at 475, 612 P.2d at 705 (the dangerous condition resulted from the failure to replace a stop sign with a traffic signal). It can be the result of a failure to maintain safety devices already in place. *Lerma ex rel. Lerma v. State Highway Dep't*, 117 N.M. 782, 784, 877 P.2d 1085, 1087 (1994) (the dangerous condition arose from the failure to properly construct and maintain a fence along a highway). The dangerous condition can also result from an inherent feature of the roadway. *Ryan*, 1998-NMCA-116, ¶ 16 (the dangerous condition was the result of animals migrating across the roadway). In each of these situations, the result is the same. As we held in *Rutherford*, "procedures for identifying hazards on roadways and the timeliness of minimizing or eliminating the risk of injury to the motoring public from those hazards constitute maintenance activities for which immunity is waived under the [Act]." 2003-NMSC-010, ¶ 7.

**{34}** Plaintiffs make the same argument in this case. Despite DOT's immunity for the initial design or redesign of NM 502, notice of a dangerous condition—whether based on the original design or some other intervening characteristic—triggers a maintenance obligation for which DOT can be held legally responsible under the Act. Whether this obligation requires a permanent solution, such as a traffic signal or a center barrier, or a temporary one, such as the moveable barriers in *Rutherford*, the maintenance obligation of reasonable care remains the same. And the reasonableness of that response to a known danger—whether with a temporary barrier or a permanent one—remains in the good hands of the jury to resolve.

10

**An Endless Immunity for Design, Ignoring Intervening Circumstances, Frustrates Legislative Purpose and Undermines Public Safety**

**{35}** Although we acknowledge textual differences between our state statutes, we are persuaded by the basic premise espoused in cases from California and Kansas—that our Legislature did not intend design immunity to continue in perpetuity. *See Mirzada v. Dep't of Transp.*, 4 Cal. Rptr. 3d 205, 208 (Ct. App. 2003) ("Design immunity does not necessarily continue in perpetuity." (internal quotation marks and citation omitted)); *Dunn v. Unified Sch. Dist. No. 367*, 40 P.3d 315, 325 (Kan. Ct. App. 2002) ("We do not believe the legislature intended governmental entities to be perpetually immune from design or planning flaws . . . ."). Allowing design immunity to continue into perpetuity would not further the purpose of design immunity, while frustrating the overall purpose of encouraging safe highway maintenance.

**{36}** As stated by the California Court of Appeals, "[t]he rationale for design immunity is to prevent a jury from second-guessing the decision of a public entity regarding a particular plan or design of a public construction or improvement." *Cornette v. Dep't of Transp.*, 95 Cal. Rptr. 2d 733, 738 (Ct. App. 2000), *superceded and aff'd by Cornette v. Dep't of Transp.*, 26 P.3d 332, 336 (Cal. 2001). Another California decision stated that legislatures do not want juries to "be allowed to second-guess the discretionary determinations of public officials by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan." *Baldwin v. State of California*, 491 P.2d 1121, 1128 (Cal. 1971), *superceded in part by* Cal. Gov't Code § 830.6.

**{37}** Plausibly, initial roadway design decisions may be based on weighing *potential* risks, looking to the future, without the benefit of an accident history or other empirical evidence demonstrating how the design works in practice. *See id. at* 1122, 1128 ("[W]e are convinced that the [l]egislature did not intend that public entities should be permitted to shut their eyes to the operation of a plan or design once it has been transferred from blueprint to blacktop."). Once a design has been put into operation, however, "there will then be objective evidence arising out of the actual operation of the plan—matters which, of necessity, could not have been contemplated by the government agency or employee who approved the design." *Id.* at 1128.

**{38}** In instances involving highways, actual traffic flow can be monitored, as opposed to potential traffic flow based on models. Actual collisions can be studied, along with ways to mitigate such occurrences in the future, based on what is actually happening on the ground. This is in contrast to what might happen in theory, should a highway be built in a particular manner. In such instances, a jury would not simply be re-weighing the same potential risks as the original designer of the roadway, but instead would be balancing inaction on the part of the governmental entity with actual facts as to how the roadway has functioned under operation. "No threat of undue interference with discretionary decision-making exists in this situation." *Id.*

**{39}** We find this reasoning persuasive. Perpetual design immunity, if broadly construed, would thwart the overarching purpose of ensuring highway safety and protecting the motoring public. As we stated in *Rutherford*, "[t]he sole purpose of waiver in Section 41-4-11(A) is to ensure that highways are made and kept safe for the traveling public." 2003-NMSC-010, ¶ 24 (internal quotation marks and citation omitted). This "sole purpose" would be frustrated if DOT could simply throw its hands up and claim immunity based on design, despite knowing, based on empirical evidence, that what was designed in theory proved fatal in fact. Taken to an extreme, perpetual design immunity would allow DOT to ignore reality and escape accountability even if a particular stretch of highway were to cause fatalities on a regular basis. We will not assume such short-sightedness in our Legislature when public safety is our mutual concern. "Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan." *Baldwin*, 491 P.2d at 1127.

## Evidence of Events Putting DOT on Notice of a Dangerous Condition

**{40}** While acknowledging the import of *Rutherford* and DOT's maintenance obligations under the Act, the district court nonetheless excluded all evidence of a history of cross-median collisions on NM 502. The court ruled that such evidence, to be relevant and admissible, "would have to show a defect in the location of the accident." As the Court of Appeals stated, "the district court determined that the previous accidents occurred too far from the location of decedents' accident to prove that the same defect or dangerous condition was present." *Martinez*, 2011-NMCA-082, ¶ 25. In addition, "the district court excluded . . . newspaper articles, citizen complaints, testimony by Plaintiffs' expert, and evidence pertaining to the configuration of the road on the basis that this evidence dealt with the design of the road . . . ." *Id.* ¶ 26. These rulings were affirmed by the Court of Appeals. *Id.* ¶ 27.

**{41}** With this evidence, Plaintiffs intended to show that DOT had notice—that it knew or should have known—of a dangerous condition along NM 502, including the collision site, sufficient to trigger a duty to take remedial measures. Whether DOT had notice is a question of fact for the jury to determine. *Ryan*, 1998-NMCA-116, ¶ 8. Notice "becomes a question of law only if no room for ordinary minds to differ exists." *Hull v. S. Coast Catamarans, L.P.*, 365 S.W.3d 35, 45 (Tex. Ct. App. 2011). By excluding this evidence, the district court essentially determined that no reasonable juror could conclude from such evidence that DOT either knew or reasonably should have known of the risk at the collision site and the need for reasonable efforts to remedy that risk. In our view, the district court took an unnecessarily narrow view of what might reasonably persuade a jury on the question of notice.

**{42}** Rather than requiring all evidence of notice to relate to the exact site of the collision, we believe that more latitude was appropriate. *See Romero*, 112 N.M. at 334, 815 P.2d at 630 (cautioning against imposing "an unduly restrictive interpretation [of] both [the] admissibility of relevant evidence and on the term 'maintenance.'"). In *Ryan*, the Court of

Appeals noted that the plaintiffs "presented affidavit evidence that a series of accidents occurred on that particular *stretch* of highway as a result of wild-animal crossings." 1998-NMCA-116, ¶ 10 (emphasis added). This is a more appropriate view of relevancy when determining whether DOT had notice of a dangerous condition along a highway.

**{43}** Depending on the particular characteristics of the road, evidence of other collisions occurring in the general area of the particular collision or in other areas with similar characteristics, may be relevant to notice. Taking a static, rigid view of the "location" of the accident takes from the jury the opportunity to decide whether DOT acted reasonably under the circumstances. Particularly when the Legislature has spoken in such broad terms, courts should be wary of preempting the role of the jury.

**{44}** The *Ryan* Court found that an issue of fact existed as to whether DOT had notice of a dangerous condition, precluding summary judgment. *Id.* ¶ 9. As noted above, the plaintiffs introduced affidavit evidence of a series of collisions with wild animals on the particular "stretch" of highway at issue. *Id.* ¶ 10. DOT countered by pointing out that there was no evidence that any such collisions had occurred in the last five years. *Id.* This was sufficient to create a question of fact for the jury to resolve. *Id.* In short, reasonable minds could differ on whether such facts were sufficient to provide DOT with adequate notice.

**{45}** The parties in this case also offered conflicting evidence. Attached to its motion for partial summary judgment, DOT offered two different expert affidavits containing the identical conclusion that "[t]he topography, terrain and curvature of NM 502 changes constantly along its 18-mile length such that the conditions of any one mile stretch are not the same as any other." A DOT assistant district engineer stated that "[b]ecause geometric design and traffic operational characteristics vary along NM 502, it is unreasonable to compare or contrast crash frequency or characteristics near milepost 9 with other sites along this route." As a result, DOT argued that other collisions occurring near mile markers 8 and 10 were not relevant to the collision in this case that occurred near mile marker 9.

**{46}** Plaintiffs countered with the affidavit of an expert which observed that "[i]n the absence of a fixed central barrier, cross-median accidents are particularly dangerous," and concluded:

> [t]he roadway, between the end of the solid barrier and the SR30 overpass at MM10, is not that different from the section of SR502 with the barrier. The road continues to have a relatively steep downhill grade, with continuous curves to the right and left in a serpentine fashion, until some distance below (to the east of) MM10. It is hard to see why all of the roadway, down to MM10 and below, should not have a solid barrier, separating the eastbound and westbound lanes.

**{47}** Based on these conflicting affidavits, it would appear that reasonable minds could differ over whether DOT should or should not have been on notice of the need to take

13

remedial action. DOT's engineer stated that it would be "unreasonable" to compare crash sites, while Plaintiff's expert essentially concluded the opposite. Questions of "reasonableness" are quintessential issues for a jury to resolve. In our system of justice, we place special confidence in juries to sort through conflicting evidence and come to a reasonable conclusion.

**{48}** By skillful cross-examination of Plaintiff's expert and use of its own experts, DOT would have been able to defend its position before the jury. DOT was free to persuade the jury how each section of NM 502 was so different that notice of a cross-over collision in one location could not reasonably put its engineers on notice of the need to prevent cross-over collisions in some other location. The court should have allowed the normal fact-finding process to proceed.

**{49}** The question of notice is not a technical one. Simply put, it requires the fact-finder to decide whether the evidence presented would alert a reasonable person of a particular fact. *See Ambassador E. Apts, Investors v. Ambassador E. Invs.*, 106 N.M. 534, 537, 746 P.2d 163, 166 (Ct. App. 1987) (applying a reasonable person standard to the issue of constructive notice). We agree with the following description from our Court of Appeals:

> In jury trials, reasonable minds are a cross-section of a community called for jury service. Each trial judge believes he has a reasonable mind, and knows what reasonable minds are, but he cannot know whether reasonable minds will differ. Where an issue of negligence is involved, ordinarily the trial court should allow a jury to determine whether "reasonable minds" can differ.

*Tapia v. McKenzie*, 83 N.M. 116, 120, 489 P.2d 181, 185 (Ct. App. 1971) (Sutin, J., specially concurring).

**{50}** It is undisputed that DOT knew of these previous collisions. NMSA 1978, Section 66-7-207(C) (2007) requires law enforcement officers to forward a written report of all accidents that result in death to DOT within 24 hours of the completion of the investigation. DOT's own affidavits concede as much. Thus, the dispute here centered around whether the fatal cross-over collisions that occurred elsewhere on NM 502 should have put DOT on notice of a potentially dangerous condition at and around mile marker 9, and the need to prevent cross-overs from occurring at that location as well. We hold that when the district court took this issue away from the jury, it committed reversible error.

**Remaining Issues**

**{51}** Plaintiffs also raise other evidentiary issues involving the admissibility of Donald Espinoza's toxicology report as well as various items found in Amelia Martinez's vehicle after the crash. The Court of Appeals discussed these evidentiary rulings in sufficient detail, which we find persuasive. *See Martinez*, 2011-NMCA-082, ¶¶ 28, 29. We affirm the Court

14

of Appeals on these issues.

**{52}** Finally, Plaintiffs argue that they, as grandparents of Amelia's unborn child, have a valid claim to the loss of consortium of their unborn grandchild, a fatality of this accident. The district court granted judgment as a matter of law on this issue in favor of DOT and the Court of Appeals declined to address it. Plaintiffs admit that they "could not find any law directly on point in any jurisdiction" that would uphold such a claim. They instead ask this Court to extend New Mexico law to allow the claim under these circumstances. We decline to make such an extension at this time.

**CONCLUSION**

**{53}** For these reasons, we reverse the Court of Appeals on the issues discussed in this opinion, and remand to the district court for a new trial consistent herewith.

**{54}** **IT IS SO ORDERED**.

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**
**Topic Index for *Martinez v. N.M. Dep't of Transp.*, No. 33,083;**

**APPEAL AND ERROR**
Remand
Standard of Review

**CIVIL PROCEDURE**
Summary Judgment

**GOVERNMENT**
Highways

**STATUTES**
Interpretation
Legislative Intent

**TORTS**
Immunity
Loss of Consortium
Negligence
Tort Claims Act
Wrongful Death